**IN RE J.B. HUNT TRANSPORT, INC., Relator**

**NO. 15–0631**

Supreme Court of Texas.

Argued March 9, 2016

Opinion Delivered May 27, 2016

Roy Alan Camberg, The Camberg Law Firm PC, Houston TX, for Other Interested Parties.

Alexander Wildey Horton, Scott C. Krist, The Krist Law Firm, P.C., Houston TX, Frank L. Branson, Law Offices of Frank L. Branson, Dallas TX, for Real Parties in Interest.

Garrett A. Gibson, Thomas C. Wright, Wright & Close LLP, Richard P. Griffin Jr., Ronald L. Bair, Bair Hilty, P.C., Houston TX, for Relator.

Justice Willett delivered the opinion of the Court.

Lanes are ubiquitous in our society. On any given day, Americans pedal along bike lanes, hurl balls down bowling lanes, and take aim in gun-range shooting lanes. This is a case about traffic and jurisdictional lanes.

A J.B. Hunt tractor-trailer traveling on I-10 in Waller County struck a disabled vehicle that had entered the tractor-trailer's lane. The vehicle's occupants were injured, and one ultimately died. J.B. Hunt sued the occupants in Waller County to recover property-damage costs. Ten days later, the occupants sued J.B. Hunt in Dallas County to recover personal-injury damages. J.B. Hunt filed a plea in abatement in the Dallas County court, arguing that the Waller County court, where suit was first filed, has dominant jurisdiction. The occupants of the car claimed, and the Dallas County court agreed, that exceptions to the first-filed rule apply and the Dallas County court has dominant jurisdiction.

In this dispute over the primacy of jurisdictional lanes, we agree with J.B. Hunt that the Waller County court has dominant jurisdiction, and the Dallas County court should have granted the plea in abatement. We therefore conditionally grant J.B. Hunt's petition for writ of mandamus.

## I

On November 24, 2014, an Isuzu Rodeo and a J.B. Hunt tractor-trailer were traveling on I-10 in Waller County—the tractor-trailer in the far right lane, and the

Isuzu in the left adjoining lane.[1] The Isuzu experienced engine failure and came to a stop in front of the tractor-trailer in the right lane. The tractor-trailer struck the Isuzu, pinning it against a construction retaining wall. Both vehicles were damaged, and the Isuzu's occupants, Jason Williams and his wife, Synthea Arms, (Real Parties) were seriously injured. Williams later died from his injuries.

The Real Parties remained in the hospital for some time. During this time, J.B. Hunt sent a claims manager and a director of litigation to the hospital, who offered to cover hotel expenses for the Real Parties' family. Additionally, although J.B. Hunt disputes these particular assertions, the Real Parties say that the claims manager told Williams's brother-in-law (1) "we figure we are liable," and (2) J.B. Hunt had "internal insurance that can handle this."

On December 1, the Real Parties' counsel notified J.B. Hunt through an evidence-preservation letter that they had been retained as counsel, and J.B. Hunt thereafter retained counsel as well. Over the next few days, counsel for both sides communicated through email and coordinated examinations of the damaged vehicles and the cell phone data from the J.B. Hunt driver's phone. One December 11 email from J.B. Hunt's counsel had "Williams v. JB Hunt" in the subject line.

On December 12, J.B. Hunt sued the Real Parties and also the Isuzu's co-owners, Charlotte Arms and Walker Shapland, in Waller County. J.B. Hunt's petition claimed that the defendants failed to prop-erly maintain and service the Isuzu and that this failure contributed to the mechanical problems that caused the accident and damage to J.B. Hunt's tractor-trailer. The petition concluded that the defendants were jointly responsible for the Isuzu's maintenance and requested actual and compensatory damages. After the clerk issued citations on December 15, J.B. Hunt's counsel emailed the Real Parties' counsel a courtesy copy of the petition and asked if they would accept service for their clients. The following day, J.B. Hunt's counsel sent a similar email, stating, "We did not ask that there be personal service as we wanted to give you the professional courtesy of accepting service for the defendants." That email concluded, "Also by noon tomorrow, please let us know if you will accept service or we will go ahead and have the constable handle it." Three days later, J.B. Hunt's counsel sent a third email, which stated, "With respect to Jason Williams and Synthea Arms we have agreed to simply hold on the service of process until the time you agree to accept service or you clear us to have them served once they have stabilized." The Real Parties say they never responded or acceded to this agreement. J.B. Hunt then served the Real Parties on January 7, 2015, and the remaining defendants on January 20, 2015.

In the meantime, the Real Parties sued J.B. Hunt and its driver in Dallas County on December 22, 2014—ten days after J.B. Hunt sued the Real Parties in Waller County—and served J.B. Hunt and the

---

1. There is some inconsistency in the record and briefing about the specific positions of the vehicles. Both parties' merits briefs say that the Isuzu was traveling ahead of the tractor-trailer in the *same* traffic lane. At the Dallas County abatement hearing, the Real Parties described the scene the same way, but J.B. Hunt argued that this description conflicted with the investigating police officer's narra-tive. That police officer's report and diagram depict the Isuzu as shifting from a left lane into the right lane in front of the tractor-trailer. It may be that all of these accounts are correct and merely describe the vehicles' positions at different points in time. The issue is not critical in this case, and we adopt the officer's description for background purposes only.

driver on December 30, 2014.[2] The Real Parties' petition claimed that the driver's negligence caused the accident and that J.B. Hunt was liable under *respondeat superior*. The petition thus requested, among other things, personal-injury damages.

Both sides then filed dueling pleas in abatement in the Waller County and Dallas County courts. The Real Parties argued that the Waller County court should abate its case because the Dallas County court has dominant jurisdiction in the case, and J.B. Hunt and its driver argued that the Dallas County court should abate its case because the Waller County court has dominant jurisdiction. For their part, the Real Parties offered three alternative arguments: (1) there is no dominant-jurisdiction question because the two suits are not inherently interrelated as required by this Court's caselaw; (2) J.B. Hunt did not have a bona fide intent to prosecute the Waller County suit; and (3) J.B. Hunt engaged in inequitable conduct that estops J.B. Hunt from claiming the Waller County court has dominant jurisdiction.

The Dallas County court held a hearing on J.B. Hunt's plea in abatement on March 27, 2015. The court agreed with J.B. Hunt that "[t]his is a case where I think you've established your prima facie; that case was filed first, because that's the general rule." Thus, the court instructed the Real Parties that "the burden shifts to you to show why an exception should apply." After hearing the parties' arguments, the court acknowledged that "it's going to take discovery to get to the bottom of ['the main theory of liability in the Waller case [which] is a failure to maintain the vehi-

cle']." The court also acknowledged that "it's going to take discovery to determine whether there's any applicable insurance, because on its face it appears that you have in that case insolvent defendants." Nonetheless, the court denied the plea in abatement: "[I]t appears to the Court it makes no sense for a rational business to have property damage in the amount stated, file a lawsuit, hiring an attorney on an hourly basis knowing that a lot of discovery is going to have to be made to even determine liability and solvency, it's a losing proposition. It's a money loser, which leads the Court to believe that the exception applies. So I'm going to deny the motion to abate." The court then signed an order, which said "the Court DENIES the Plea in Abatement" and "this court assumes dominant jurisdiction of this suit." J.B. Hunt later asked the court for clarification on which exception the court's ruling rested and requested findings of fact and conclusions of law. The court denied both requests, stating, "I think the order is clear." J.B. Hunt then filed a petition for writ of mandamus in the Dallas Court of Appeals.

While that mandamus petition was pending, the Waller County court held its own hearing and focused on "the effect of standing down or not standing down" vis-à-vis the Dallas County court. After the hearing, the Waller County court issued its own findings of fact and conclusions of law. In particular, the court concluded that "[n]o exception to the rule that the first court where a lawsuit is filed acquires dominant jurisdiction exists in [the Waller County suit]." Nevertheless, the court abated the suit pending the outcome of the

---

**2.** The Real Parties' petition asserted that Dallas County is a county of proper venue because J.B. Hunt's principal office in Texas exists in Dallas County. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3). J.B. Hunt's coun-

sel suggested at oral argument that it is unclear whether Dallas County is indeed a county of proper venue. For purposes of this case, we assume without deciding that Dallas County is a county of proper venue.

mandamus petition in the Dallas Court of Appeals.

The Dallas Court of Appeals summarily denied J.B. Hunt's request for mandamus relief, whereupon J.B. Hunt filed a mandamus petition in this Court. After granting J.B. Hunt's request for a temporary stay of proceedings in the Dallas County court, we set J.B. Hunt's petition for oral argument.

## II

Our analysis in this case proceeds in three distinct parts. First, we ask whether there is an inherent interrelation between the subject matter of the two pending lawsuits that triggers a dominant-jurisdiction question. Second, if an inherent interrelationship exists, we ask whether the trial court abused its discretion in denying J.B. Hunt's plea in abatement. And third, if the trial court did abuse its discretion, we ask whether J.B. Hunt is entitled to mandamus relief. We answer "yes" to all three questions and conditionally grant J.B. Hunt's petition for writ of mandamus.

## A

■ We begin our analysis by asking whether we must reach the dominant-jurisdiction question. Our decision in *Wyatt v. Shaw Plumbing Co.* explains that this question only arises "[w]hen an inherent interrelation of the subject matter exists in two pending lawsuits." [3] If such an inherent interrelationship exists, we then assess

dominant jurisdiction. But if not, then dominant jurisdiction is not an issue, and both suits may proceed.

■ The parties agree on this much but disagree on how to determine whether the requisite inherent interrelationship exists, a disagreement that arises in part from conflicting language we used in *Wyatt*. In one paragraph in *Wyatt*, we said that "[i]n determining whether an inherent interrelationship exists, courts should be guided by ... the compulsory counterclaim rule." [4] But in an earlier paragraph, we said that a counterclaim is compulsory if, among other things, "it is not at the time of filing the answer the subject of a pending action." [5]

There are two mistakes in that rendition of the compulsory-counterclaim rule. One problem is that the compulsory-counterclaim rule, located in Texas Rule of Civil Procedure 97(a), refers to "the time of filing the *pleading*," [6] not "the time of filing the *answer*" as we suggested. We therefore clarify that Rule 97 refers to *pleadings*, not *answers*. [7]

■ But the second, and more problematic, issue is that we erroneously conflated two distinct requirements in Rule 97(a). The first three clauses of Rule 97(a) read as follows: "A pleading shall state as a counterclaim any claim within the jurisdiction of the court, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party[.]" [8] Our decision in *Wyatt*

---

**3.** 760 S.W.2d 245, 247 (Tex.1988).

**4.** *Id.*

**5.** *Id.* We later repeated this language in *Ingersoll–Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 207 (Tex.1999).

**6.** Tex. R. Civ. P. 97(a) (emphasis added).

**7.** *Id.* For a clean distinction between the two terms, *compare Pleading*, Black's Law Dictio-

nary (10th ed. 2014) ("A formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses."), *with Answer, id.* ("A defendant's *first* pleading that addresses the merits of the case, usu. by denying the plaintiff's allegations." (emphasis added)).

**8.** Tex. R. Civ. P. 97(a).

combined "at the time of filing the pleading [or 'answer,' as we erroneously thought]" with "not the subject of a pending action," creating the phrase "[the claim] is not at the time of filing the answer the subject of a pending action." But the third clause plainly does not modify the second clause—it would be odd to describe "a pending action" that "the pleader has against any opposing party." Instead, the third clause must modify the word "claim" in the first clause. This point is confirmed by the text of the federal compulsory-counterclaim rule, upon which we have said Rule 97(a) is based:[9] "A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party[.]"[10]

This means that the second clause—"not the subject of a pending action"—is a standalone, unmodified phrase that modifies "claim" in the first clause as well. And as the federal analogue illustrates, the claim must not have been the subject of a pending action *when the original suit was commenced.*[11] If courts were to look at any subsequent snapshot in time, a wily litigant could avoid the compulsory-counterclaim rule by filing a second suit before

that point in time to ensure that the litigant's claims are "the subject of a pending action."[12] The craftiness that would flow from such an interpretation would thwart the compulsory-counterclaim rule's function and purpose of "avoid[ing] multiple lawsuits."[13] We decline to adopt an interpretation that would render this rule toothless. In short, a counterclaim is compulsory if, in addition to Rule 97(a)'s other requirements, it was not the subject of a pending action when the original suit was commenced.

Here, the Real Parties do not dispute that their claims in the Dallas County suit were not the subject of a pending action at the time J.B. Hunt filed its Waller County petition. Nor do the Real Parties dispute that the subject matter of the claims in the two suits otherwise satisfies the compulsory-counterclaim rule. Because "an inherent interrelation of the subject matter exists in [the] two pending lawsuits,"[14] we proceed to the dominant-jurisdiction question.

**B**

We conduct our dominant-jurisdiction analysis under the deferential abuse-of-discretion standard.[15] A trial court abuses its

9. *Ingersoll–Rand Co.,* 997 S.W.2d at 208 ("The Texas compulsory counterclaim rule is based on Rule 13 of the Federal Rules of Civil Procedure.").

10. Fed. R. Civ. P. 13(a)(1).

11. *See* Fed. R. Civ. P. 13(a)(2)(A) ("The pleader need not state the claim if ... when the action was commenced, the claim was the subject of another pending action[.]").

12. *See Commint Tech. Servs., Inc. v. Quickel,* 314 S.W.3d 646, 651–52 (Tex.App.–Houston [14th Dist.] 2010, no pet.) ("We conclude the Texas Supreme Court did not intend through an application of its compulsory counterclaim test, that it would create such an easy path of avoidance and thereby increase the number of

lawsuits filed."); *see also* Michol O'connor, O'connor's Texas Rules * Civil Trials, § 6.1, at 148 (2015) ("If the claim cannot be the subject of a pending suit 'at the time of filing the answer,' as stated by the Supreme Court, a party could avoid the compulsory-counterclaim rule by filing suit against the opposing party immediately after being served with notice of suit and before the answer is due in the original suit." (citing *Commint Tech. Servs., Inc.,* 314 S.W.3d at 652)).

13. *Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 246–47 (Tex.1988).

14. *Id.*

15. *See, e.g., Street v. Honorable Second Ct. of Appeals,* 756 S.W.2d 299, 300 (Tex.1988).

discretion when it acts "arbitrarily, unreasonably, or without regard to guiding legal principles."[16] With regard to factual questions, the abuse-of-discretion standard is more akin to a clear-error standard.[17] But with regard to questions of law, "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts."[18] This principle applies "even when the law is unsettled."[19] We must thus carefully establish the controlling legal principles at issue in this case.

■ "The general common law rule in Texas is that the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other coordinate courts."[20] As a result, when two suits are inherently interrelated, "a plea in abatement in the second action *must* be granted."[21] This first-filed rule flows from "principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues."[22] The default rule thus tilts the playing field in favor of according dominant jurisdiction to the court in which suit is first filed. All parties agree here that this rule favors the Waller County court.

This issue, therefore, comes down to the exceptions to that general rule, and the

Real Parties rely upon two such exceptions. The first requires inequitable conduct by the first-filer that estops the first-filer from asserting that the first court has dominant jurisdiction.[23] The second requires that the first-filer lack the intent and diligence to prosecute the first lawsuit.[24] But all of the Real Parties' evidence—even assuming the disputed evidence in the Real Parties' favor—falls well below the legal standards for these exceptions.

**1**

■ The first exception—the inequitable-conduct exception—provides that "the plaintiff in the first suit may be guilty of such inequitable conduct as will estop him from relying on that suit to abate a subsequent proceeding brought by his adversary."[25] The purpose of this exception is to prevent a first-filer from unjustly claiming dominant jurisdiction in the first court when that priority was obtained through underhanded means.[26] For example, in *V.D. Anderson Co. v. Young*, we held this exception was satisfied because there was a fact issue as to whether the first-filers were "guilty of certain acts of fraud and deceit" that caused the second-filer to de-

---

**16.** *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998).

**17.** *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex.1997).

**18.** *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992).

**19.** *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex.2004) (orig.proceeding).

**20.** *Curtis v. Gibbs*, 511 S.W.2d 263, 267 (Tex. 1974).

**21.** *Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 247 (Tex.1988) (emphasis added). *See also Curtis*, 511 S.W.2d at 267 ("Any subsequent suit involving the same parties and the same controversy must be dismissed if a party to that suit calls the second court's attention to the pendency of the prior suit by a plea in abatement.").

**22.** *Wyatt*, 760 S.W.2d at 248.

**23.** *Id.*

**24.** *Id.*

**25.** *Curtis*, 511 S.W.2d at 267.

**26.** *See Perry v. Del Rio*, 66 S.W.3d 239, 252 (Tex.2001) ("The first-filed rule admits of exceptions when its justifications fail, as when ... the race to the courthouse was unfairly run.").

lay filing the second suit.[27] By contrast, we held in *Wheeler v. Williams* that this exception was not satisfied where the party opposed to abatement "failed to raise any fact issues" as to bad faith and fraud.[28]

 Against this legal framework, the Real Parties' merits brief lists five informational bullet points that they say establish J.B. Hunt's inequitable conduct in this case: (1) J.B. Hunt sent its claims manager to the hospital to express condolences and said "we figure we are liable"; (2) the claims manager offered to cover hotel room expenses and said J.B. Hunt had "internal insurance that can handle this"; (3) J.B. Hunt's employees never mentioned a property-damage claim to the Real Parties or their counsel; (4) J.B. Hunt's counsel frequently inquired about the Real Parties' health, but did not mention a property-damage claim; and (5) J.B. Hunt's counsel sent an email entitled "Williams v. JB Hunt," implying that J.B. Hunt was defending against a personal-injury claim and not prosecuting its own claim. As we noted above, J.B. Hunt disputes some of these assertions, but we take them as true for purposes of this case.

But even assuming this conduct is inequitable, these claims fail to satisfy the inequitable-conduct standard. Specifically, the Real Parties emphasize the purported inequity of J.B. Hunt's conduct, but they never complain that J.B. Hunt's conduct in fact caused them to delay filing their Dallas County suit.[29] In the Dallas County court, the Real Parties' response to J.B. Hunt's plea in abatement only argued that "Hunt engaged in deceptive conduct designed to hinder the Plaintiffs from filing its [sic] suit more promptly." Similarly, the Real Parties' one-paragraph argument in their response to the petition and two-page argument in their merits brief on this issue focus only on the purported inequitable conduct without claiming that it caused them to delay filing suit. But establishing inequitable conduct alone is insufficient. This is because the inequitable-conduct exception functions as a remedy for a second-filer who is delayed—that is, prejudiced—by inequitable conduct. If there is no prejudice and no allegation of prejudice, then there is no harm to remedy. For that reason alone, assuming J.B. Hunt's conduct was inequitable, the Real Parties fatally failed to allege that the conduct caused their delay, if any, in filing suit.

### 2

 The second exception upon which the Real Parties rely is satisfied when the first-filer filed suit merely to obtain priority, without a bona fide intention to prosecute the suit.[30] We have said that "the mere physical filing of the petition is not sufficient" to establish the requisite intent.[31] Instead, the first-filer must exhibit "actual diligence thereafter in getting out citation and otherwise prosecuting his

---

27. *V. D. Anderson Co. v. Young,* 128 Tex. 631, 101 S.W.2d 798, 799 (1937).

28. *Wheeler v. Williams,* 158 Tex. 383, 312 S.W.2d 221, 228 (1958).

29. *See Curtis,* 511 S.W.2d at 267 (describing a prior allegation that first-filers *"prevented their adversaries from filing the subsequent suits more promptly by fraudulently representing that they would settle"* (emphasis add-

ed)); *V.D. Anderson Co.,* 101 S.W.2d at 799 (in which the second-filer alleged that the first-filers' "acts of fraud and deceit ... *caused* [the second-filer] to delay the filing of the [second] suit" and that *"but for* such fraud and deceit" the second-filer would have sued first) (emphasis added)).

30. *Curtis,* 511 S.W.2d at 267.

31. *V. D. Anderson Co.,* 101 S.W.2d at 800–01.

suit."[32] *Reed v. Reed* presents perhaps the clearest picture of a lack of diligence, because there we held that a first-filer's 15–month delay in requesting a citation for service of process satisfied this exception.[33] By contrast, in *Curtis v. Gibbs*, we held that the exception was not satisfied even though a first-filer delayed 26 days before procuring and serving a citation.[34]

The evidence in this case clearly falls on the *Curtis* side of the line. Three days after J.B. Hunt sued the Real Parties, its counsel asked the Real Parties' counsel if they would accept service for their clients. The next day, J.B. Hunt's counsel again sent an email asking the same question.[35] In that email, J.B. Hunt's counsel demanded that the Real Parties not permit the Isuzu to be "drug all over the place," because "[t]he more the vehicle is moved around the more chance there is that some of the evidence will disappear." The email concluded with a request for "possession of [the Isuzu] until we can complete our inspections without interference," otherwise J.B. Hunt would "file and ask for a TRO in the court in Waller county where the case is pending." And then three days later— now, seven days after filing suit—J.B. Hunt's counsel sent the Real Parties' counsel a detailed email that listed tasks to be completed, including: (1) data extraction from the J.B. Hunt driver's phone; (2) data extraction from the tractor-trailer's Bendix system (which controls air brake systems); (3) soot analysis from the Isuzu; and (4) mechanical inspection of the Isuzu.

And although we accept as true the Real Parties' argument that they did not agree to this final provision of the email, J.B. Hunt's counsel stated that, as to the Real Parties, J.B. Hunt would "simply hold on the service of process until the time you agree to accept service or you clear us to have them served once they have stabilized." These acts—in particular, attempting to obtain waivers of personal service and threatening to obtain a TRO in the court in which J.B. Hunt just sued—are quintessential acts of prosecuting a suit.[36]

Now, the Real Parties recycle a laundry list of "circumstantial evidence" that they say shows J.B. Hunt sued "not because it wanted to recover property damages, but because it intended to secure a favorable venue to defend a significant personal-injury case." But there are at least three distinct flaws in that argument.

First, intending to secure a favorable venue is not impermissible. In fact, one of the justifications of the first-filed rule is "simple fairness: in a race to the courthouse, the winner's suit *should* have dominant jurisdiction."[37] A problem only arises—and this exception is only satisfied—when the race to the courthouse is not followed by a bona fide intent to prosecute the suit. When the first-filer is actually progressing through attempts to complete service of process and discovery matters as J.B. Hunt did, however, these

---

32. *Reed v. Reed*, 158 Tex. 298, 311 S.W.2d 628, 631 (1958).

33. *Id.*

34. *Curtis*, 511 S.W.2d at 267–68.

35. To the extent the Real Parties are concerned with email titles, this email was entitled "JBH v. Williams."

36. *See Curtis*, 511 S.W.2d at 268 (crediting "evidence show[ing] that, during that time, [the first-filer] attempted to obtain a waiver of service"); *Prosecute*, BLACK's LAW DICTIONARY (10th ed. 2014) ("To commence and carry out (a legal action) <because the plaintiff failed to prosecute its contractual claims, the court dismissed the suit>.").

37. *Perry v. Del Rio*, 66 S.W.3d 239, 252 (Tex. 2001) (emphasis added).

actions exhibit a bona fide intent to prosecute the suit.

■ Second, the Real Parties' proffer of evidence purporting to show that J.B. Hunt's Waller County suit "d[oes] not make economic sense" and "was not to recover property damages" misunderstands the inquiry under this exception. Everyone agrees that J.B. Hunt incurred property-damage costs and can pursue a cause of action against the Real Parties. To be sure, J.B. Hunt's case may be weak, it may be strong, it may be odd, or it may be brilliant—but those are all merits questions, not questions about whether J.B. Hunt is actually following through with its suit. In other words, this exception concerns only whether the first-filer has demonstrated a bona fide intent to prosecute its suit (what has the first-filer *done*?), not whether the suit "makes no sense," as the trial court put it (*why* did the first-filer do what it has done?).[38] As a legal matter, where a party has a cause of action, files suit, and immediately takes steps to advance that suit, that party cannot be said to lack the bona fide intent to prosecute its case.

And third, the subtext of the Real Parties' argument is that J.B. Hunt should have waited to be sued (perhaps in a forum in which J.B. Hunt would rather not be sued), even though J.B. Hunt has a cause of action. That argument essentially crowns the Real Parties as the "real" plaintiffs who alone are entitled to select the forum of battle.[39] But sorting out winners and losers is the whole point of a trial, not a plea in abatement. It would be odd and premature to require a potential litigant sit on his hands because his claim, viable though it may be, could be countered by an equally viable claim. A potential litigant need not do so.

Finally, the Real Parties separately claim that J.B. Hunt lacked the requisite diligence in serving the Real Parties.[40] As part of this claim, the Real Parties argue that "J.B. Hunt did not make one attempt to serve Williams and Arms until January 7, 2015, twenty-six days after it filed suit." But J.B. Hunt attempted multiple times to have the Real Parties' counsel accept service on behalf of their clients, and the Real Parties' counsel candidly concede that they rejected these attempts. Thus, the Real Parties essentially fault J.B. Hunt for not sending a constable to the hospital rooms of the Real Parties, one of whom would later die from his injuries, to serve them with process. Diligence does not compel such insensitivity. In the same vein, the Real Parties say that it is "incumbent on the serving party to explain the delay and the attempts at service that were made in that time." Assuming such an explanation is required, and even assuming that the Real Parties did not agree to what J.B.

---

38. Of course, if the first-filer's claim were frivolous, we have said that "[h]aving filed claims that clearly cannot be prosecuted, [the first-filer] should be estopped from arguing dominant jurisdiction." *Perry*, 66 S.W.3d at 252. That is not the case here, because the trial court expressly stated, "I mean, I don't think one could say, and I don't think they've said, that the lawsuit in Waller County is frivolous on the merits[.]"

39. In fact, in their response to J.B. Hunt's plea in abatement in the Dallas County court, the Real Parties made exactly this argument:

"Jason Williams and Synthea Arms are the real Plaintiffs with a 'bona fide intent to prosecute their claims to judgment', not J.B. Hunt."

40. *See Reed v. Reed,* 158 Tex. 298, 311 S.W.2d 628, 631 (1958) ("[W]hatever the intention of the filer of the first suit at the time of depositing his original petition with the clerk, his lack of actual diligence thereafter in getting out citation and otherwise prosecuting his suit will ordinarily defeat his plea of prior action pending against the second suit.").

Hunt says was an agreement, J.B. Hunt's unilateral explanation was "we have agreed to simply hold on the service of process until the time you agree to accept service or you clear us to have them served once they have stabilized." This explanation, together with J.B. Hunt's completion of service within 26 days as we approved in *Curtis*,[41] does not demonstrate a lack of diligence as a matter of law.

\* \* \*

Taking these analyses together, the facts in this case do not satisfy the legal standards for the exceptions to the first-filed rule. Our caselaw requires alleged "facts which, if established, would estop the plaintiff in the prior action from asserting his plea in abatement."[42] The Real Parties have not alleged such facts, and the trial court abused its discretion in not granting J.B. Hunt's plea in abatement.

## C

Because the trial court abused its discretion, the final question before us is whether J.B. Hunt is entitled to mandamus relief. The answer to this question turns in part on the governing legal standard, which the parties, and various courts of appeals, have thoughtfully debated. One view is that the standard in *Abor v. Black* controls;[43] the other view is that the more recent standard in *In re Prudential Insurance Co. of America* abrogated the *Abor* standard and thus controls.[44] As we explain below, the latter view is correct, and J.B. Hunt is therefore entitled to mandamus relief.

*Abor* and its progeny concern the availability of mandamus relief specifically as to pleas in abatement. *Abor* held that mandamus relief is unavailable to correct an erroneous denial of a plea in abatement where there is "no conflict of jurisdiction"—that is, there was no injunction or order in one court "which actively interferes with the exercise of jurisdiction" in the other court.[45] We later held that conflicts such as overlapping trial dates satisfy the *Abor* standard,[46] but in general, the standard is a stringent one. As we said a few Terms ago, "[p]leas in abatement are incidental rulings, the denial of which ordinarily does not support mandamus relief."[47] That stringency makes *Abor* a wasteful standard in cases where a trial court abused its discretion by not granting a plea in abatement but there is no requisite conflict of jurisdiction: An appellate court cannot correct the reversible error through mandamus relief, which then leads to "the gross and unnecessary waste of economic and judicial resources" as the

---

41. *Curtis*, 511 S.W.2d at 267–68. As the Real Parties note, unlike here, the second-filer in *Curtis* did not file suit or serve a citation during the 26-day delay. But there is nothing talismanic about what the second-filer does within the period of delay. It was relevant in *Curtis* only to our additional point that, in any event, the first-filer there would have had priority even if the first-filer filed suit on the date the citation was ultimately procured. *See id.* Of course, we cannot make the same point here, because the Real Parties did file suit and serve process before J.B. Hunt completed service of process. But at the end of the day, the focus of this inquiry is not on who first completed service, but rather on whether the first-filer was *diligent* in prosecuting the suit.

42. *Id.* at 267.

43. 695 S.W.2d 564 (Tex.1985).

44. 148 S.W.3d 124 (Tex.2004) (orig.proceeding).

45. *Abor*, 695 S.W.2d at 567.

46. *See Perry v. Del Rio*, 66 S.W.3d 239, 258 (Tex.2001).

47. *In re Puig*, 351 S.W.3d 301, 306 (Tex.2011) (orig.proceeding).

case is tried in the wrong court only to be automatically reversed on appeal after judgment.[48]

■ In 2004, we revisited the contours of mandamus relief in *In re Prudential Insurance Co. of America*.[49] We reaffirmed that entitlement to mandamus relief requires the relator to establish both (1) a trial court's abuse of discretion, and (2) no adequate remedy by appeal.[50] As to adequate remedy by appeal, we explained that "adequate" is "a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts."[51] In particular, mandamus review is not—and should not be—an easily wielded tool, but such review of significant rulings in exceptional cases may be essential to, among other things, "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings."[52]

The flexibility of the *Prudential* balancing test differs notably from the rigidity of the *Abor* active-interference standard. Many Texas courts of appeals have split on the question of whether *Prudential* abrogates *Abor* and permits more flexible mandamus review of erroneously denied pleas in abatement in dominant-jurisdiction cases.[53]

■ We now hold that *Prudential* indeed abrogates *Abor*'s inflexible understanding of an adequate remedy by appeal. Permitting a case to proceed in the wrong court necessarily costs "private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings."[54] That was often the vice of *Abor*'s strict standard. But *Prudential*'s virtue is that it spares private parties and the public those costs. *Abor* is therefore at odds with *Prudential* and no longer provides the governing standard for an adequate remedy by appeal.[55] Therefore, a relator need only establish a trial court's abuse of discretion to demonstrate entitlement to mandamus relief with regard to a plea in abatement in

48. *E.g., Coastal Oil & Gas Corp. v. Flores*, 908 S.W.2d 517, 518 (Tex.App.–San Antonio 1995, no writ) (Green, J.).

49. 148 S.W.3d 124 (Tex.2004) (orig.proceeding).

50. *Id.* at 135–36.

51. *Id.* at 136.

52. *Id.*

53. *Compare In re Fort Apache Energy, Inc.*, 482 S.W.3d 667, 668–69 (Tex.App.–Dallas 2015, orig. proceeding), *In re E. Beach Project Phase I, Ltd.*, No. 14–11–00393–CV, 2011 WL 2650946, at *3 (Tex.App.–Houston [14th Dist.] July 7, 2011, orig. proceeding) (mem.op.), *and In re Brown*, No. 06–10–00108–CV, 2010 WL 4880675, at *2 (Tex.App.–Texarkana, Nov. 30, 2010, orig.proceeding) (mem.op.) (all holding that *Abor* remains good law), *with In re ExxonMobil Prod. Co.*, 340 S.W.3d 852, 859 (Tex.

App.–San Antonio 2011, orig. proceeding), *and In re Truck Ins. Exchange*, No. 12–12–00183–CV, 2013 WL 1760793, at *2 (Tex.App.–Tyler Apr. 24, 2013, orig. proceeding) (mem.op.) (both holding that *Prudential* abrogates *Abor* ).

54. *Prudential*, 148 S.W.3d at 136.

55. *See Sw. Bell Tel. Co. v. Mitchell*, 276 S.W.3d 443, 447 (Tex.2008) ("[W]e adhere to our precedents for reasons of efficiency, fairness, and legitimacy, and when adherence to a judicially-created rule of law no longer furthers these interests, the general interest will suffer less by such departure, than from strict adherence, we should not hesitate to depart from a prior holding." (internal quotation marks and footnotes omitted)); *Mitchell v. Mitchell*, 157 Tex. 346, 303 S.W.2d 352, 355 (1957) (stating that "the doctrine of stare decisis does not absolutely bind this court to follow its prior decisions," particularly if "our prior decision was not sound, and ... good reasons exist for overruling it").

a dominant-jurisdiction case. J.B. Hunt has done so here.

\* \* \*

The dispute in this case boils down to cries (from both sides) of foul play, gamesmanship, and forum-shopping. That is to be expected: "It is not unusual for parties with a choice of forums to prefer one over another, and when more than one party can sue on the same subject matter, they may choose different courts."[56] In fact, we even expect "a race to the courthouse, [in which case] the winner's suit should have dominant jurisdiction."[57] That expectation holds true so long as the "race to the courthouse was [not] unfairly run."[58] It holds true here. Because no exception to the first-filed rule applies, the Waller County court is entitled to dominant jurisdiction, and the Dallas County court should have granted J.B. Hunt's plea in abatement.

We conditionally grant mandamus relief and direct the trial court to grant J.B. Hunt's plea in abatement. We are confident the trial court will promptly comply, and our writ will issue only if it does not.

---

**56.** *Perry v. Del Rio,* 66 S.W.3d 239, 252 (Tex. 2001).

