**Conditionally Granted; Opinion Filed December 8, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-01078-CV

## IN RE CTMI, LLC, MARK BOOZER, AND JERROD RAYMOND, Relators

**Original Proceeding from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-05360**

# MEMORANDUM OPINION

Before Justices Bridges, Myers, and Whitehill
Opinion by Justice Myers

The underlying dispute in this original proceeding relates to the interpretation of the

rights and duties of the parties under a settlement agreement made in 2011. Relators ("CTMI")

filed a lawsuit in Tarrant County seeking declaratory relief as to their rights and duties under the

agreement. Thereafter, the real parties in interest ("the Fischer parties") filed a lawsuit involving

the same issues and parties in Dallas County. CTMI filed a plea to the jurisdiction in the Dallas

County case, arguing the Tarrant County court acquired dominant jurisdiction over the issues

because that lawsuit was filed first. The Fischer parties argued that CTMI may not rely on the

first-filed rule to establish jurisdiction in Tarrant County. The Dallas County court agreed with

the Fischer parties and denied CTMI's plea to the jurisdiction. CTMI now seeks mandamus

relief from the Dallas court's order denying the plea in abatement. We granted CTMI's motion

for a temporary stay of proceedings in the trial court pending review of the original proceeding

and requested responses to the petition. After reviewing the petition, the responses, and the record, we conditionally grant the writ.

## BACKGROUND AND PROCEDURAL HISTORY

In 2011, the parties settled part of a case involving a dispute over the sale of a business. In the rule 11 settlement agreement, which was dictated into the record, the parties agreed to entry of a $1.7 million judgment to address one aspect of the dispute and agreed to allow the trial court to resolve one issue of contract interpretation. The parties also agreed to allow the contract interpretation ruling to be appealed, and agreed that the party who ultimately prevailed on that issue would be entitled to receive fifteen percent of gross receipts collected by CTMI from certain projects during the course of the appellate process. Those funds were to be kept in an escrow account established and held by attorney Wesley Holmes. CTMI was required to fund the escrow account as revenue from the Devon projects[1] was received. The fifteen percent gross receipts would be distributed to the party who ultimately prevailed on appeal. Following appeals to this Court and the Texas Supreme Court, Ray Fischer ultimately prevailed on the issue of contract interpretation and was entitled to distribution of fifteen percent of the gross revenue being held in escrow. *See Ray Fischer and Corporate Tax Management, Inc. v. CTMI, L.L.C.*, 479 S.W.3d 231 (Tex. 2016). The Supreme Court's mandate issued in that appeal on February 19, 2016.

The current dispute relates to the money owed to Fischer from escrow. Relators claim they complied with their responsibilities under the settlement agreement by placing all required funds into the escrow account held by Holmes. However, CTMI alleges that Holmes absconded with the money it placed in the escrow account. On March 7, 2016, after discovering the missing funds, relators filed a declaratory judgment action in the 48th Judicial District Court of Tarrant

---

[1] These were business transactions involving Devon Energy (Devon).

County seeking a declaration of the parties' rights and responsibilities under the settlement agreement. The Fischer parties moved to transfer the Tarrant County case to Dallas County. The Tarrant County court denied the motions to transfer venue on July 22, 2016. Prior to that order, on May 3, 2016, the Fischer parties had filed a lawsuit in Dallas County asserting that CTMI breached the settlement agreement and seeking damages for the alleged breach. CTMI moved to abate the Dallas County suit, asserting the Tarrant County case was filed first and, as such, the Tarrant County court acquired dominant jurisdiction over the claims related to the terms and enforcement of the settlement agreement. The Dallas court disagreed and denied the motion to abate. This original proceeding followed.

## STANDARD OF REVIEW

To be entitled to mandamus relief, the relator must demonstrate that the trial court clearly abused its discretion and the relator has no adequate remedy by appeal. *In re Lee*, 411 S.W.3d 445, 463 (Tex. 2013) (orig. proceeding); *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011) (orig. proceeding); *In re Prudential Ins. Co. of America*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). "[A] relator need only establish a trial court's abuse of discretion to demonstrate entitlement to mandamus relief with regard to a plea in abatement in a [case involving] dominant jurisdiction." *In re J.B. Hunt Transp., Inc.*, 492 S.W.3d 287, 299–300 (Tex. 2016) (orig. proceeding).

## APPLICABLE LAW

The general rule regarding dominant jurisdiction is that "the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other coordinate courts." *Id*. at 294

(quoting *Curtis v. Gibbs*, 511 S.W.2d 263, 267 (Tex. 1974)). When two suits are inherently interrelated, the court in which the second action was filed must grant a plea in abatement unless an exception to the general rule applies. *In re J.B. Hunt Transp.*, 492 S.W.3d at 299–300. "Filing a plea in abatement is the proper method for drawing a court's attention to another court's possible dominant jurisdiction." *In re Puig*, 351 S.W.3d 301, 305 (Tex. 2011) (per curiam). Generally, the plea in abatement must be granted when an inherent interrelation of the subject matter exists in the two pending lawsuits. *Perry v. Del Rio*, 66 S.W.3d 239, 252 (Tex. 2001). Abatement of a suit due to the pendency of a prior suit is based on the principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues. *Miles v. Ford Motor Co.*, 914 S.W.2d 135, 138 (Tex. 1995) (per curiam).

Exceptions to this "first-filed" rule may apply when its justifications fail, such as when the first court does not have the full matter before it, when conferring dominant jurisdiction on the first court will delay or even prevent a prompt and full adjudication, or "when the race to the courthouse was unfairly run." *Perry*, 66 S.W.3d at 252. A plaintiff who filed the first suit may be estopped from asserting the dominant jurisdiction of the first court if it is found that he is guilty of inequitable conduct. *Hiles v. Arnie & Co., P.C.*, 402 S.W.3d 820, 825–26 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). The inequitable conduct exception is central to this case because the Fischer parties maintain that CTMI engaged in inequitable conduct before filing the Tarrant County action and, as such, the Dallas court properly determined the first-filed rule does not apply here.

Texas courts have found parties guilty of inequitable conduct and applied the estoppel exception to the first-filed rule when the plaintiffs in the first-filed suit (1) filed suit merely to obtain priority, without a bona fide intention to prosecute the suit; or (2) prevented their adversaries from filing the subsequent suits more promptly by fraudulently representing that they

–4–

would settle. *In re Henry*, 274 S.W.3d 185, 191 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *Johnson v. Avery*, 414 S.W.2d 441, 443 (Tex. 1966) and *Russell v. Taylor*, 121 Tex. 450, 458–59, 49 S.W.2d 733, 736 (1932)). Other examples of inequitable conduct sufficient to defeat the first-filed rule are when the plaintiffs in the first-filed suit affirmatively represented to the court in the second-filed suit that it had jurisdiction, or manipulated the courts by sitting in silence while conflicting orders on the same subject matter are issued in another court. *In re Henry*, 274 S.W.3d at 191 (citing *Howell v. Mauzy*, 899 S.W.2d 690, 698 (Tex. App.—Austin 1994, writ denied) and *Grimes v. Harris*, 695 S.W.2d 648, 651–52 (Tex. App.— Dallas 1985, orig. proceeding)). In *Russell v. Taylor*, for example, the plaintiff in the first-filed action instructed the clerk not to issue citation unless directed to do so. *Russell*, 49 S.W.2d at 735. A few days later, the defendant in the first action filed suit in another county on the same issues and claims. *Id.* Plaintiff number one filed a plea in abatement, and plaintiff number two filed a sworn controverting affidavit alleging that plaintiff number one did not intend to issue process and prosecute the suit, but rather filed the first action only to prevent plaintiff number two from filing the latter suit on the note. *Id.* The Texas Supreme Court held that the controverting affidavit raised a question of fact that was to be decided exclusively by the judge in the second suit. *Id.* at 737–38. Similarly, in *Johnson v. Avery* the evidence supported allegations that the party who had first filed suit fraudulently induced opposing counsel to delay filing suit. 414 S.W.2d at 442.

This Court found inequitable conduct in *Grimes v. Harris*, where the parties to a divorce pending in Dallas County did not tell the Dallas Court that the wife was pregnant when they filed the divorce action, they participated in a later-filed action in Collin County brought by the prospective adoptive parents of the infant, they failed to inform the Dallas court of the Collin County action when they sought an order making the wife the managing conservator of the

infant, and they allowed the Dallas court to issue an order making the wife the infant's managing conservator in direct conflict with the Collin County court's order that was issued 13 days earlier naming the adoptive parents managing conservators. *Grimes*, 695 S.W.2d at 652. A week after the Dallas court signed its divorce decree and conservatorship orders, the adoptive parents filed a motion to modify the decree in the Dallas suit. *Id*. The Dallas court first learned of the Collin County suit and conservatorship order from that filing. *Id*. On appeal, this Court concluded that the Collin County court had dominant jurisdiction over the infant even though the Dallas suit was filed first because the wife engaged in inequitable conduct by sitting in silence and allowing the Collin County case to proceed and then seeking contradictory relief in the Dallas Court without informing that court of the Collin County proceedings. *Id*.

The Texas Supreme Court recently confirmed that "establishing inequitable conduct alone is insufficient" because the inequitable-conduct exception is a remedy for the second-filer "who is delayed—that is, prejudiced—by inequitable conduct. If there is no prejudice and no allegation of prejudice, then there is no harm to remedy." *In re J.B. Hunt Transp.,* 492 S.W.3d at 294–95. In *J.B. Hunt*, however, the real parties never argued that the inequitable conduct caused them to delay filing suit. *Id*. Rather, the real parties argued that the relator's conduct was "designed to hinder" the real parties' efforts to file suit. *Id*.

## DISCUSSION

CTMI argues that the Tarrant County case was filed first, that no exception to the general rule applies, and, as such, the Dallas court abused its discretion by denying the plea in abatement. The Fischer parties argue the general rule does not apply because CTMI engaged in inequitable conduct that prevented the Fischer parties from filing their lawsuit first. Specifically, the Fischer parties claim that CTMI indicated it was going to pay the money owed from escrow even though CTMI knew the money had been pilfered. The Fischer parties insist that CTMI misled

–6–

them in order to buy time to file the Tarrant County suit in CTMI's chosen venue and to prevent the Fischer parties from filing suit first in Dallas.

We conclude that the record does not support the Fischer parties' contention that CTMI engaged in inequitable conduct or that CTMI's conduct prevented them from filing suit in Dallas first. The Fischer parties contend that the following alleged conduct was inequitable:

- CTMI failed to provide complete documentation of the deposits made into the escrow account and the monies received from the Devon and DCP projects[2] during the course of the four-year appellate process.

- CTMI failed to provide account statements of the escrow account during the course of the four-year appellate process.

- On February 24, 2016, after the Supreme Court of Texas issued its mandate, CTMI's counsel, Andrew Turner, sent an e-mail to the Fischer parties' counsel in which he stated that he was "gathering the supporting documents for the various Devon/DCP projects" and asked for the Fischer parties' wiring instructions "to facilitate payment of the escrow funds."

- The Fischer parties contend that Turner's e-mail was a representation that the monies owed Fischer pursuant to the agreement would be forthcoming.

But there is no evidence showing that either Turner or CTMI knew on or before February 24, 2016, that the money had been pilfered and that CTMI's deposits were gone. The Fischer parties' counsel acknowledged he had no evidence that the information and documents produced by CTMI and Turner before CTMI filed the Tarrant County suit were false or that Turner or CTMI knew the information was false. It is undisputed that CTMI discovered Holmes's actions sometime after Turner sent the February 24, 2016 e-mail. According to CTMI's new counsel, once CTMI discovered the money was gone, CTMI worked quickly to confirm that Holmes did not intend to repay the pilfered funds and then quickly filed suit to protect CTMI's interests. CTMI's conduct before it knew the money had been pilfered cannot be considered inequitable because there is no indication they had knowledge different from the Fischer parties that could

---

[2] These were transactions involving Devon Energy (Devon) and DCP Midstream, L.P., a/k/a Duke Energy (DCP).

be used in an unfair manner.

The Fischer parties argue it was inequitable for CTMI to file suit before telling the Fischer parties that Holmes had stolen the money. However, CTMI had the right to protect its own interests by filing suit after it discovered Holmes's misconduct. *See generally Texas Beef and Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996) (" ' 'Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right.' ' ") (quoting *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 972 (Tex. Civ. App.—Amarillo 1932, writ ref'd) (quoting 1 R.C.L. § 6 at 319)))). CTMI was not required to give the Fischer parties the Holmes information and then wait to be sued. As the Texas Supreme Court stated in the *J.B. Hunt* case:

> And third, the subtext of the Real Parties' argument is that J.B. Hunt should have waited to be sued (perhaps in a forum in which J.B. Hunt would rather not be sued), even though J.B. Hunt has a cause of action. That argument essentially crowns the Real Parties as the 'real' plaintiffs who alone are entitled to select the forum of battle. But sorting out winners and losers is the whole point of a trial, not a plea in abatement. It would be odd and premature to require a potential litigant sit on his hands because his claim, viable though it may be, could be countered by an equally viable claim. A potential litigant need not do so.

*In re J.B. Hunt Transp.,* 492 S.W.3d at 297. Moreover, there is no evidence CTMI took any action to prevent the Fischer parties from discovering the money was gone. The Fischer parties presented no evidence they were prevented from contacting Holmes directly for payment or prevented from filing suit as a matter of right when the appellate mandate issued. The Fischer parties presented no evidence that CTMI withheld the information with the intent to win the race to the courthouse or to prevent the Fischer parties from filing suit. The only evidence presented established that CTMI filed suit quickly to protect its own interests after discovering the money was gone. There is no evidence CTMI stalled the Fischer parties' efforts to get information from Holmes or that CTMI avoided the Fischer parties' calls or demands after they discovered the

–8–

money had been stolen. CTMI discovered what happened and, within days, filed the Tarrant County suit. CTMI was permitted to do this and was under no obligation to first confer with the Fischer parties—their potential opponents. *See id.* Hence, the Dallas court's finding that CTMI engaged in inequitable conduct is not supported by the evidence and is contrary to *J.B. Hunt.* Nonetheless, even assuming for purposes of this opinion that CTMI's failure to immediately tell the Fischer parties of Holmes's action was inequitable, the evidence does not support a finding that the conduct prevented or delayed the Fischer parties from filing suit in Dallas before CTMI could file suit in Tarrant County. As such, that conduct was insufficient as a matter of law to support denial of the plea in abatement. *See id.* (inequitable conduct alone is insufficient to defeat the first-filed rule).

The Fischer parties argue they would have filed suit against CTMI earlier had they known the escrow account balance did not include the amounts CTMI claimed to have deposited during the course of the appeal. The Fischer parties allege CTMI "knew that the Fischer Parties had delayed the filing of the lawsuit to collect the monies due to them based upon, inter alia, the CTMI Parties' representation made in February 2016 that the settlement funds were forthcoming." But the reporter's record references cited by the Fischer parties do not support their suggestion that CTMI knew the Fischer parties were delaying filing suit based on Turner's February 24, 2016 e-mail. Indeed, according to the reporter's record of the hearing on the plea in abatement, CTMI's new counsel, Robert Myers, states that he truly believed Turner did not know the money was gone when he sent the February 24, 2016 e-mail:

MR. MYERS: Yeah. I truly believe he did not know — (unintelligible).

THE REPORTER: I'm sorry?

MR. MYERS: When he wrote the e-mail, I truly believe he did not know.

THE COURT: But at some CTMI knew, right?

MR. MYERS: Yes.

THE COURT: Because they filed a lawsuit within two weeks.

MR. MYERS: Yes.

During that same hearing, Myers also indicates that once CTMI discovered the money was gone and Holmes made clear he would not pay it back, Myers expected the Fischer parties to sue Holmes but did not expect them to sue CTMI: "I would have fully expected them to sue Mr. Holmes. I don't know why it is that they think that they need to sue my clients who have done everything that they were supposed to do under that agreement." Myers further states that CTMI had no choice at that point but to sue Holmes and seek a declaratory judgment that CTMI had fulfilled its side of the settlement agreement by depositing all monies required into the escrow account:

> I mean, I don't know what my clients do other than what they did, which was to sue Mr. Holmes and to sue these people for declaratory relief because they read the agreement to say we had to pay the money twice. We read it, and I think it's pretty clear, to say that once we had put it into the Holmes trust account our obligation is over.

The record simply does not show any intent to delay the Fischer parties from filing suit. On the contrary, the record shows CTMI's counsel protected CTMI's interests by filing suit in Tarrant County on March 7, 2016, shortly after discovering Holmes's conduct. There is no evidence CTMI knew there was a race to the courthouse or that it took any steps to unfairly win such a race. Rather, CTMI learned of Holmes' actions and quickly acted to protect its rights and seek redress from Holmes.

The *J.B. Hunt* case is instructive. That case arose from a fatal vehicle accident in which a J.B. Hunt tractor-trailer struck a disabled vehicle that had entered the tractor-trailer's lane. *In re J.B. Hunt Transp.,* 492 S.W.3d at 289. J.B. Hunt sued the occupants in Waller County to recover property-damage costs. *Id.* Ten days later, the occupants sued J.B. Hunt in Dallas County to recover personal-injury damages. *Id.* J.B. Hunt filed a plea in abatement in the Dallas court,

arguing that the Waller County court, where suit was first filed, had dominant jurisdiction. *Id.*

The occupants of the car claimed, and the Dallas court agreed, that exceptions to the first-filed

rule apply and the Dallas court had dominant jurisdiction. There, as here, the real parties in

interest argued the inequitable-conduct exception applied to prevent J.B. Hunt from relying on

the first-filed rule. They argued the following constituted inequitable conduct[3]:

1.      J.B. Hunt sent its claims manager to the hospital to express condolences and said "we figure we are liable";

2.      The claims manager offered to cover hotel room expenses and said J.B. Hunt had "internal insurance that can handle this";

3.      J.B. Hunt's employees never mentioned a property-damage claim to the Real Parties or their counsel;

4.      J.B. Hunt's counsel frequently inquired about the Real Parties' health, but did not mention a property-damage claim; and

5.      J.B. Hunt's counsel sent an email entitled "Williams v. JB Hunt," implying that J.B. Hunt was defending against a personal-injury claim and not prosecuting its own claim.

*Id.* at 294–95. Simply put, they contended that J.B. Hunt led them to believe J.B. Hunt did not

intend to sue for property damages and, therefore, the real parties did not have to race to the

courthouse to file their personal injury and wrongful death claims.

The Texas Supreme Court concluded that those claims, even if considered inequitable,

"fail to satisfy the inequitable-conduct standard" because the evidence did not show that the

alleged conduct caused real parties to delay filing suit. *Id.* at 295. Although the real parties

emphasized the purported inequity of J.B. Hunt's conduct, they never complained that J.B.

Hunt's conduct in fact caused them to delay filing their Dallas County suit. *Id.* In the Dallas

County trial court, the real parties' response to J.B. Hunt's plea in abatement only argued that

"Hunt engaged in deceptive conduct designed to hinder the Plaintiffs from filing its [sic] suit

more promptly." *Id.* The court held that establishing inequitable conduct alone was insufficient:

---

[3] The court took these assertions as true for purposes of the opinion.

> This is because the inequitable-conduct exception functions as a remedy for a second-filer who is delayed—that is, prejudiced—by inequitable conduct. If there is no prejudice and no allegation of prejudice, then there is no harm to remedy. For that reason alone, assuming J.B. Hunt's conduct was inequitable, the Real Parties fatally failed to allege that the conduct caused their delay, if any, in filing suit.

*Id.*

CTMI's alleged conduct, like J.B. Hunt's post-suit actions, did not cause the Fischer parties to delay in filing suit. Furthermore, the record includes no evidence that CTMI withheld the information about Holmes's actions because CTMI wanted to beat the Fischer parties to the courthouse. The only evidence of why CTMI filed suit quickly after learning of Holmes's actions was that CTMI wanted to protect its interests under the settlement agreement. A desire to protect one's own interests is not the same as a desire to harm or hamper another party's attempts to protect its interests, nor is it evidence of a desire to circumvent the choice of forum. *See, e.g., Sweezy Const., Inc. v. Murray*, 915 S.W.2d 527, 532 (Tex. App.—Corpus Christi 1995, no writ) ("We believe that the type of misconduct necessary to invoke as an exception to the general rule of dominant jurisdiction must in some manner involve or circumvent the choice of forum, and not merely go to the merits of the underlying lawsuit. There is no indication in the present case that Sweezy made the allegedly false claims specifically in order to obtain venue of the present lawsuit in Hidalgo County.").

The cases relied on by the Fischer parties are distinguishable. In *Hiles*, the defendant filed suit in Dallas County after agreeing to venue in Harris County and then evaded service of the Harris County suit so that he could proceed with the Dallas County suit and delay the Harris County suit. *Hiles*, 402 S.W.3d at 829. The *Hiles* court noted that "Hiles's actions could be seen as demonstrating contempt for legal process and a willingness to unfairly manipulate the system to his advantage." *Id.* In the present case, by contrast, there is no evidence CTMI engaged in such manipulation. Rather, CTMI learned of Holmes's actions and filed suit to protect its

–12–

interests.  *In re Pasadena Independent School District*, 76 S.W.3d 144, 147–48 (Tex. App.—Amarillo 2002, no pet.) is also distinguishable because in that case relators failed to file a complete reporter's record and, therefore, failed to provide evidence to overcome the deference given to the trial court's determination that they had engaged in inequitable conduct.  *Id.* at 147–48.  *In re Pasadena* does not stand for the proposition that a trial court's findings must be afforded complete and total deference, nor has such a case been cited to us.  *See id*.  And in this case, the Dallas County court's finding of inequitable conduct is contradicted by the evidence and the law, as explained in *In re J.B. Hunt Transport*.

Accordingly, we conditionally grant the relators' petition for writ of mandamus.  A writ will issue only in the event the trial court fails to vacate its August 26, 2016 order denying the relators' plea in abatement and entering an order granting the plea in abatement.  We lift the stay imposed by this Court on September 14, 2016.

161078F.P05

/Lana Myers/
LANA MYERS
JUSTICE