

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| ENCORE ENTERPRISES, INC., A TEXAS CORPORATION, ENCORE BORDERPLEX, LLC, EMF GRAND MISSION INVESTMENTS, LP, AND ENCORE MF SENDERO, L.P., | § § § § | No. 08-17-00153-CV |
|  | § | Appeal from |
| Appellants, | § | County Court at Law No. 6 |
| v. | § | of El Paso County, Texas |
| BORDERPLEX REALTY TRUST, A MARYLAND REAL ESTATE INVESTMENT TRUST, AND BRT REALTY OPERATING LIMITED PARTNERSHIP, | § § § | (TC # 2016-DCV2446) |
| Appellees. | § |  |

**O P I N I O N**

This accelerated interlocutory appeal arises from a race to the courthouse. The winner of that race, Borderplex Realty Trust and its related entity, obtained an anti-suit injunction from an El Paso trial court that precluded litigation of several claims in a later filed Dallas lawsuit. The loser of the race, Encore Enterprises, Inc. and its related entities, now raise several procedural and substantive challenges to the anti-suit injunction. Under the record before us, we affirm.

**BACKGROUND**

The underlying lawsuits involve a multi-million-dollar real estate transaction that never came to fruition. Encore Enterprises, Inc., Encore Borderplex, LLC, EMF Grand Mission

Investments, LP, and Encore MF Sendero, LP (collectively, "Encore") held five properties that were in various stages of development as multi-family apartments. Borderplex Realty Trust and its related entity BRT Realty Operating Limited Partnership (collectively, "Borderplex") supposedly had access to available capital. They both agreed that Encore would for the most part sell or contribute its properties to a new entity that Borderplex would for the most part fund. The new entity would then issue to both Encore and Borderplex ownership shares reflective of their respective contributions. Designated members of both Encore and Borderplex would then manage the new entity.

The parties' agreement is memorialized in a December 17, 2015 "Contribution Agreement." Under the Contribution Agreement, on or before the date of an "initial closing," the new entity would be formed, and both parties would execute a separate "Operating Agreement," that as its name suggests, defined the logistics of developing and managing the properties. The parties were obligated to execute the Operating Agreement "in substantially the form" as it was attached to the Contribution Agreement. The Operating Agreement, however, as attached was incomplete on its face. It contains a blank for an effective date ("Effective as of February ___, 2016") and it omits several schedules, such as those including a budget, the calculation of incentive fees, and employee compensation schedules.

The Contribution Agreement contemplated that there could be several closings, as each of the five Encore properties were either sold or contributed to the new entity. The initial closing involved the "Sendero Ranch Apartments," and Borderplex contends its closing was a condition precedent to the entire agreement. However, the initial closing never took place. Apparently, a Borderplex investor failed to provide funding under a separate subscription agreement and

Borderplex declined to close on any of the properties.[1]   Unhappy with this state of affairs, Encore on April 18, 2016, placed Borderplex on formal notice that it was in default under the Contribution Agreement for failing to make the initial closing.

## The El Paso Lawsuit

Borderplex responded by filing this declaratory judgment lawsuit in El Paso County on June 29, 2016 (the "El Paso lawsuit").   The El Paso lawsuit principally alleges that the first closing was prevented by third parties, or conditions precedent that were never met, and that Borderplex did not breach the Contribution Agreement.   The suit initially sought declarations that Borderplex was under no obligation to close, that Encore was not entitled to recover damages, and that Borderplex's performance was excused by Encore's material breach of the Contribution Agreement and/or promissory estoppel.

Encore answered and later filed a motion to dismiss, or in the alternative, motion to abate Borderplex's case based on an arbitration clause in the Operating Agreement.   The El Paso court heard and denied that motion on April 3, 2017.   Encore has appealed that decision which is pending before this Court.   Relevant to this case, however, Encore opened another front in this battle by filing its own lawsuit in Dallas County, Texas.

## The Dallas Lawsuit

On April 28, 2017, Encore filed a separate lawsuit in the 101st District Court of Dallas County, Texas (the "Dallas lawsuit").   In the Dallas lawsuit, Encore alleges that individual members of Borderplex's Board of Trustees[2] committed acts of fraudulent inducement, fraud, and

---

[1] Failing the initial closing, Borderplex was obligated to pay a substantial break-up fee, which it contends that it has paid to Encore.

[2] Encore names as individual defendants William D. Sanders, William David Bernard, J.A. Cardwell, Myriam G. De La Vega, James C. Potts, Jeffrey Perea-Branch, M. Scott Schwartz, all members of the Board of Trustees, and A. Richard Moore, an advisory member of the same board.

3

fraudulent non-disclosure in the negotiation and implementation of the Contribution and Operating Agreements. More specifically, the original petition in the Dallas lawsuit makes the following factual allegations:

Beginning in 2014, William Sanders, a member of Borderplex's board of trustees, represented to Encore's principals that he was personally able to raise more than enough money to fund this project. Moreover, he assured Encore that when the transaction was complete, Encore would have two representatives on the board of the new entity and that Borderplex would have three; no other person or entity was being made such an offer. Any additional board slots would be available only after a private placement memorandum distributed to institutional level investors initially closed. Encore alleges that these representations were false, as Sanders was not able to raise sufficient funds on his own, and that he intended to allow an undisclosed third party to control appointments to the new board of managers. The suit claims that Sanders had enlisted a third party, Daniel Burrell, to raise the funds and offered him representation on the board in proportion to the funds raised.

Richard Moore, an advisor to the Borderplex board, allegedly made similar false representations regarding Sanders's ability and intention to raise sufficient funds. The suit alleges that the Borderplex entities (though not parties to the Dallas litigation), also represented through the Contribution Agreement, the Operating Agreement, and the exchange of drafts of both those documents, that the new entity would have a five-person board of managers of which three were appointed by Borderplex and two by Encore. The Borderplex entities similarly represented that the Contribution Agreement and Operating Agreement were approved by the Borderplex board of trustees.

4

Borderplex issued a private placement memorandum that it shared with Encore to raise the $39,990,000 contemplated for the transaction. Just prior to the execution of the Contribution Agreement, defendant Moore allegedly represented that the Contribution and Operating Agreements were all agreed to. Defendant David Willian Bernard allegedly represented that all the money for the first two closings had been raised, and that Borderplex was prepared to close at any time. ) Encore contends that these representations were false, and that Borderplex always intended to reopen the terms of the Operating Agreement for negotiation. Shortly after the Contribution Agreement was signed, Borderplex issued a supplemental private placement memorandum, allegedly stating that Borderplex had been in negotiations with a Burrell controlled entity for several months, and at a time before when Borderplex signed the Contribution Agreement. The supplemental placement memorandum contemplated that the new investor would have rights to appoint persons to Borderplex's board. Encore further claims that Burrell was insisting on changes to the terms of the Operating Agreement. Consistent with its theory, Encore alleges that Borderplex in fact proposed material changes to the Operating Agreement after the Contribution Agreement was already executed.

### The Anti-Suit Injunctions

Borderplex amended its petition in the El Paso lawsuit on June 5, 2017, and asked the El Paso court to restrain and enjoin Encore from prosecuting the Dallas lawsuit. Borderplex set a hearing on the injunction for June 21, 2017. On June 16, 2017, Bernard filed a motion to transfer venue and answered Encore's petition in the Dallas lawsuit. That same day, and without notice to any of the trustee defendants, Encore sought and obtained an *ex parte* temporary restraining order from the Dallas court.[3]

---

[3] Borderplex notes that Encore had deposed Bernard as recently as June 15, 2017 in the El Paso lawsuit and learned

In its temporary restraining order, the Dallas court found "that unless restrained, the Borderplex Parties are likely to proceed with a hearing on their application for temporary and permanent injunction to restrain and enjoin the Encore Parties from prosecuting" the Dallas lawsuit. Encore would then "suffer immediate and irreparable harm because they will be deprived of the ability to prosecute" the Dallas lawsuit and "would be denied their right to seek appellate review" from the Dallas Court of Appeals.

The Dallas court found that "ex parte relief is appropriate" because if notice was provided, the Borderplex parties "could seek a temporary restraining order preventing the Plaintiffs from seeking this order." Based on these and additional findings, the Dallas court ordered as follows:

> **IT IS THEREFORE ORDERED** that the Plaintiffs and their attorneys and all persons in active concert or participation with them are immediately enjoined such that the Encore Parties and their attorneys are permitted to continue prosecuting this Dallas Fraud Suit regardless of any anti-suit order, restraining order, or any other order that may be issued by another court interfering with this Court's jurisdiction or the Encore Parties' right to prosecute their claims in this Court. (The Dallas court set a hearing on a temporary injunction for June 22, 2017, a status hearing a month later, and concluded by stating:
>
> This Order is intended only to protect the jurisdiction of the 101st Judicial District Court of Dallas County, Texas with respect to the Dallas Fraud Suit. It is not intended to affect, and does not affect, the jurisdiction of the El Paso County Court at Law Number Six from presiding over the El Paso Lawsuit or the parties or attorneys therein. Meanwhile, back in El Paso, the El Paso court proceeded with its temporary injunction hearing on June 21, 2017. At the hearing, the arguments focused on (1) the TRO entered by the Dallas court (with its injunction hearing set for the next day), (2) the propriety of the El Paso court entering an anti-suit injunction before the Dallas court ruled on a plea in abatement, and (3) whether the El Paso court had acquired dominant jurisdiction over the claims asserted in Dallas. At the conclusion of the hearing, the El Paso court announced that it would enter the injunction as to claims related to the Contribution Agreement, and the court dictated several findings to be included in the order.

---

the identity of the firm that would be filing an answer on his behalf.

Later that afternoon, the El Paso court signed an order enjoining and restraining Encore from prosecuting the Dallas lawsuit in any manner or as to any issues relating to the negotiation, validity, enforceability, interpretation, or the performance or non-performance of the parties under the Contribution Agreement, but expressly permitted Encore to prosecute fraud claims in the Dallas court that do not relate to the Contribution Agreement, and that are not inconsistent with the temporary injunction. Encore quickly complained that it did not have an opportunity to approve the order as to form. At a subsequent hearing before the El Paso court on July 6, 2017, Encore asked the court to rescind its order. The court was also informed that in the interim, the Dallas court had declined to issue a temporary injunction and its TRO had expired by its own terms. Encore re-urged that an anti-suit injunction was improper, and that the only correct procedure available to Borderplex was to file a motion to abate with the Dallas court. At the conclusion of the hearing, the judge stated that she would take the matter under advisement. Encore's counsel gently pressed for a ruling, but at one point declared, "We'll appeal the existing order." The trial court then advised, "Actually, if you're going to do that, then there is nothing for me to do. Go ahead and appeal it."

The El Paso court's temporary injunction order makes several findings, including that "the facts and subject matter of the Dallas Lawsuit are interrelated to the facts and subject matter" of the El Paso lawsuit. Though the parties are different, the El Paso court found that the "Dallas Lawsuit is based on alleged actions by the trustees of [Borderplex] in their capacity as trustees and is tantamount to a lawsuit directly against Plaintiff [Borderplex]." Additionally, the El Paso court concluded that "Plaintiffs have also demonstrated a probable right to relief and imminent, irreparable harm, for which there is no adequate remedy at law." The order then commands:

7

**IT IS THEREFORE ORDERED, ADJUDGED and DECREED** that Defendants, their agents, employees, representatives, attorneys, and anybody acting under their direction or control, or in concert with them, are hereby **IMMEDIATELY ENJOINED AND RESTRAINED** from prosecuting the Dallas Lawsuit, including without limitation, filing any motions or requesting any relief (other than a motion for voluntary dismissal or non-suit), conducting discovery, requesting a trial setting, or seeking adjudication of any legal or factual issues, in any manner or as to any issues that relate to the negotiation, validity, enforceability, interpretation, or the performance or non-performance of the parties under the Contribution Agreement; provided, however, that Defendants may prosecute fraud claims in Dallas that do not relate to or touch upon the Contribution Agreement and that are not inconsistent with this Temporary Injunction.

## DISCUSSION

In four issues, Encore appeals the El Paso court's issuance of the anti-suit injunction. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 51.014(a)(4)(West Supp. 2017)(allowing appeal from an interlocutory order granting or refusing temporary injunction). Encore's first two issue are procedurally based--they claim that an anti-suit injunction is available only in limited circumstances and upon certain showings, and that procedurally, Borderplex should have first filed and obtained a ruling on a plea in abatement in the Dallas lawsuit. Encore's later two issues address the substantive issue of dominant jurisdiction--the core requirement by which the El Paso suit might divest the Dallas court of jurisdiction to hear its suit. In its third issue, Encore contends that dominant jurisdiction only exists where suits are against adverse parties in the same capacity, something it contends is missing here. In its fourth issue, Encore contends that there is no inherent interrelation between the subject matter of the two lawsuits. It claims the Dallas suit involves fraudulent misrepresentation, fraudulent nondisclosure, and fraud claims that require no contract interpretation, while the El Paso suit seeks only to declare rights under a contract. We take the issues out of order and first address whether the El Paso Court has dominant jurisdiction.

### Principles of Dominant Jurisdiction

"In instances where inherently interrelated suits are pending in two counties, and venue is

8

proper in either county, the court in which suit was first filed acquires dominant jurisdiction." *In re Red Dot Bldg. Sys., Inc.*, 504 S.W.3d 320, 322 (Tex. 2016); *see also In re J.B. Hunt Transp., Inc.*, 492 S.W.3d 287, 294 (Tex. 2016)(orig. proceeding); *Gonzalez v. Reliant Energy, Inc.*, 159 S.W.3d 615, 622 (Tex. 2005). The court hearing the second filed action is required to abate the second suit. *In re Red Dot Bldg. Sys., Inc.*, 504 S.W.3d at 322; *In re J.B. Hunt Transp. Inc.*, 492 S.W.3d at 294. The necessity for such a rule is self-evident: two parallel lawsuits waste judicial resources, create delay, and impair "an orderly procedure in the trial of contested issues." *Perry v. Del Rio*, 66 S.W.3d 239, 252 (Tex. 2001)(orig. proceeding), *quoting Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 248 (Tex. 1988). "A further justification is simple fairness: in a race to the courthouse, the winner's suit should have dominant jurisdiction." *Perry*, 66 S.W.3d at 252. "The default rule thus tilts the playing field in favor of according dominant jurisdiction to the court in which suit is first filed." *In re J.B. Hunt Transp., Inc.*, 492 S.W.3d at 294 (footnotes and internal quotations omitted). "As long as the forum is a proper one, it is the plaintiff's privilege to choose the forum," and a defendant is "simply not at liberty to decline to do battle in the forum chosen by the plaintiff." *Wyatt*, 760 S.W.2d at 248.

We conduct our dominant jurisdiction analysis under the deferential abuse of discretion standard. *In re J.B. Hunt Transp., Inc.*, 492 S.W.3d at 293. "A trial court abuses its discretion when it acts 'arbitrarily, unreasonably, or without regard to guiding legal principles.'" *Id.* at 294, *quoting Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). As to factual disputes, we will defer to the trial court, particularly when "there are two permissible views of the evidence." *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997), *quoting Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). But with regards to questions of law, "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts."

9

*Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

**Inherent Interrelationship**

We start with the fundamental question of whether the subject matter of the El Paso and Dallas lawsuits are inherently interrelated. In determining whether the suits are inherently interrelated, we are guided in part by the compulsory counterclaim rule, TEX.R.CIV.P. 97(a). *In re J.B. Hunt Transp., Inc.*, 492 S.W.3d at 292, *citing Wyatt*, 760 S.W.2d at 247.

A counterclaim is compulsory if it meets the following six characteristics: (1) it is within the jurisdiction of the court; (2) it is not at the time of the filing of the answer the subject of a pending action; (3) the action is mature and owned by the defendant at the time of filing the answer; (4) it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; (5) it is against an opposing party in the same capacity; and (6) it does not require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction. *See* TEX.R.CIV.P. 97(a); *see also Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 207 (Tex. 1999); *Wyatt*, 760 S.W.2d at 247. Of these six requirements, Encore challenges only the fourth element (arises out of the transaction or occurrence) and fifth element (whether the Dallas lawsuit is against the same opposing party and in the same capacity as in the El Paso lawsuit).

*Same Transaction or Occurrence*

To determine whether counterclaims arise out of the same transaction or occurrence, we apply a logical relationship test. *Moore v. First Fin. Resolution Enterprises, Inc.*, 277 S.W.3d 510, 516 (Tex.App.--Dallas 2009, no pet.), *citing Jack H. Brown & Co. v. Nw. Sign Co.*, 718 S.W.2d 397, 400 (Tex.App.--Dallas 1986, writ ref'd n.r.e.). Application of this test requires that at least some of the facts surrounding the causes of action arise from the same transaction or occurrence. *Jack H. Brown & Co.*, 718 S.W.2d at 400. The logical relationship test is met when

10

the same facts, which may or may not be disputed, are significant and logically relevant to both claims. *Id.* When none of the facts are relevant to the various causes of action, there is no "logical relationship." *Id.*

The test is met on this record. Both lawsuits focus on the same transaction. Borderplex asserts in the El Paso lawsuit that it did not breach the Contribution Agreement because one or more conditions precedent were not met. The Dallas lawsuit arises out of claims that Borderplex trustees made fraudulent representations (or omissions) about Borderplex's ability to fulfill its obligations under the same Contribution Agreement. But the connection runs deeper than that. The El Paso lawsuit claims one of the conditions precedent involved "the failure of a key third party investor to provide the agreed upon funding for the transaction." The Dallas lawsuit alleges the third-party investor demanded additional control and changes in the terms of the Operating Agreement before making the investment. The El Paso lawsuit contends that the Operating Agreement which would have governed a substantial part of the overall transaction "was only partially negotiated, i.e., the parties had not agreed on all of the essential provisions and terms thereof." Conversely, the Dallas lawsuit maintains that Borderplex and its trustees had represented that all the material terms of the Operating Agreement were agreed to. The Dallas lawsuit further claims that Borderplex attempted to renegotiate the Operating Agreement, while the El Paso lawsuit claims both parties were negotiating the unresolved terms of the Operating Agreement, and in that process, Encore "made promises, representations and commitments to [Borderplex] with respect to these matters which they subsequently failed to comply with and honor."

The Dallas lawsuit contends that the false representations and non-disclosures resulted in damages, including a claim for benefit-of-the-bargain damages. Those damages presuppose that

11

the transaction would have otherwise closed. *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)("Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim."). Whether ultimately provable or not, the El Paso lawsuit claims that transaction could not close because Encore had not obtained required consents from six of its lenders. That common issue of fact could necessarily be litigated in both cases to determine if Encore is entitled to benefit-of-the-bargain damages.

These deep connections distinguish this case from *Freeman v. Cherokee Water Co.*, 11 S.W.3d 480 (Tex.App.--Texarkana 2000, pet denied), upon which Encore relies. In *Freeman* the court decided that a suit to construe a single clause in a deed was not logically related to a counterclaim seeking to set aside the entire deed based on the fraudulent execution of the same deed. *Id.* at 483. The single clause at issue had nothing to do with the basis for the fraud claim. *Id*. In the case before us, the fraud allegations in the Dallas lawsuit intertwine with the same conditions precedent that form the basis of the El Paso litigation. Fraud and contract claims might well share a logical relationship depending on the facts at issue. *See Community State Bank v. NSW Investments, L.L.C.*, 38 S.W.3d 256 (Tex.App.--Texarkana 2001, pet. dism'd w.o.j.) (fraudulent inducement claims in executing guarantees were logically related to claim enforcing guarantees); *White Stores, Inc. v. Nowaski*, 760 S.W.2d 53, 55 (Tex.App.--Fort Worth 1988, no writ)(same). They do here, and the two suits meet the same transaction or occurrence element under Rule 97(a). We overrule Issue Four.

### *Same Parties in the Same Capacity*

In Issue Three, Encore contends that the two suits cannot be inherently interrelated because the compulsory counterclaim rule requires an identity of opposing parties who are sued *in the same capacity*. The El Paso lawsuit pits Borderplex against Encore. In the Dallas lawsuit, Encore sued

only Borderplex's trustees and one advisor. In its temporary injunction order, however, the El Paso court found that the Dallas suit is based on the alleged actions of Borderplex's trustees in their capacity as trustees, which renders Encore's Dallas suit tantamount to a lawsuit directly against Borderplex. Encore challenges this finding, claiming that the fraud claims necessarily assert only individual liability.

The compulsory counterclaim rule itself does not explicitly use the phrase "opposing party in the same capacity." *See* TEX.R.CIV.P. 97(a). That was a gloss added by courts interpreting the rule. The question arose when one party appeared in a representative capacity, but the person fulfilling that role might have, or be subject to, a claim in their individual capacity. Several courts have held that for the purposes of Rule 97(a) that they were effectively two different persons. *See Stevenson v. Reese,* 593 S.W.2d 828, 830 (Tex.Civ.App.--Houston [14th Dist.] 1980, writ ref'd n.r.e.)(trustee's suit in his individual capacity was not compulsory counterclaim in suit against trustee in his representative capacity arising out of the same transaction); *Robertson v. Estate of Melton,* 306 S.W.2d 811, 813 (Tex.Civ.App.--Beaumont 1957, writ ref'd)(tort claim against widow in her representative capacity as administratrix of estate was not compulsory counterclaim in tort suit arising out the same transaction brought by widow in her individual capacity). When the Supreme Court summarized the six-part test for compulsory counterclaims in *Wyatt v. Shaw Plumbing Co*., it included the "same capacity" element as part of the requirement. 760 S.W.2d at 247.

Yet the same *Wyatt* court refers to Rule 97 as a *guide* to finding inherent interrelationship. *Id*. ("In determining whether an inherent interrelationship exists, courts should be *guided by the rule* governing persons to be joined if feasible and the compulsory counterclaim rule.) [Emphasis added]. The court has not directed that we strictly apply the compulsory counterclaim rule as we

13

might if the issue were an actual application of Rule 97(a) to a true Rule 97(a) question. And in using Rule 97(a) as a guide, courts have not required that the precise issues and all the parties be included in the first suit, provided that the claims in the first suit can be amended to bring in all the necessary parties and claims. *In re Coronado Energy E & P Co., L.L.C.*, 341 S.W.3d 479, 482 (Tex.App.--San Antonio 2011, orig. proceeding), *citing Wyatt*, 760 S.W.2d at 246-47. Moreover, *Wyatt* originally stated that the inherent interrelationship question was guided by both Rule 97(a)(the compulsory counterclaim rule) and Rule 39(a)(the joinder of party rule). *Wyatt*, 760 S.W.2d at 247. Language in the opinion states the two rules as disjunctive options for analyzing inherent interrelationship. *Id*. at 248 ("Moreover, the parties in the second suit were either present in the first suit, or parties who should have been joined in the first suit."). Rule 39(a) allows a party to be joined when among other things, the person's absence would create a substantial risk of an existing party incurring "inconsistent obligations." TEX.R.CIV.P. 39(a). We perceive that risk here. If the fraud claims are not litigated alongside the declaratory judgment claim, then separate tribunals could reach different conclusions as to whether the essential terms of the Operating Agreement were agreed, or whether all the conditions precedent to the closings were met. While the doctrine of issue preclusion might ameliorate against outright conflicting findings, the pendency of those common issues in both suits would only create a second footrace, this time a race to see who can first set the case for trial. Of further note, the El Paso court is empowered to bring any necessary parties before it, including the Borderplex trustees, and there has been no showing that any necessary party cannot be joined. *See Wyatt*, 760 S.W.2d at 248.

The El Paso trial court also found that found that the Dallas suit is based on alleged actions of Borderplex's trustees in their capacity as trustees, and is thus tantamount to a lawsuit directly against Borderplex. The El Paso court might have reached that conclusion based on the petition

14

in the Dallas lawsuit which alleges that *Borderplex as an entity* made fraudulent representations through its approval of the Contribution Agreement, and sending earlier drafts of the document. Borderplex could have done so only through its agents and employees. Borderplex also urged below that its organic documents indemnify its trustees to the fullest extent of Maryland law. Maryland law allows a corporation to "indemnify any director made a party to any proceeding by reason of service in that capacity" unless one of several exceptions apply. MD. CODE ANN., Corporate Indemnification § 2-418(b)(1)(West 2009); *see also Kramer v. Liberty Prop. Trust*, 968 A.2d 120, 122 (Md. 2009)(applying Section 2-418 to trustee of real estate investment trust). Relevant here, those exceptions include (1) actions "committed in bad faith" (2) "active and deliberate dishonesty" or (3) the "director actually received an improper personal benefit in money, property, or services." *Id*. We do not find those specific allegations asserted in the Dallas lawsuit. The suit only details specific representations of three of the eight named individuals. The other five defendants would be included in general allegations against the "Board Defendants." Those general allegations include actions such as approving private placement memorandums, the Contribution Agreement, and Operating Agreement As a factual matter, the El Paso trial court could have found that at least some of the trustees could be indemnified by Borderplex, and that the Dallas suit as those trustees was a suit against Borderplex.[4]

We overrule Issue Three.[5]

---

[4] The trustees were entitled to ask not only for indemnification, but could seek funds "to pay or reimburse reasonable expenses in advance of final disposition of a proceeding . . . ." Borderplex could find itself paying for the entire defense costs of its trustees until the Dallas lawsuit concludes, and a court then determines whether the fraud allegations are the equivalent of "bad faith" or "deliberate dishonesty" under Maryland law.

[5] Issue Three can also be read to complain that the trial court erred by concluding it had dominant jurisdiction without first determining whether the subject matter of the two suits are inherently interrelated. The record does not show that the court failed to consider Encore's contentions as presented during hearings in the El Paso court and in Encore's brief in opposition prior to ruling on the matter of dominant jurisdiction.

15

**Dominant Jurisdiction**

Based on the trial court's finding of an inherent interrelation of the subject matter between the El Paso and Dallas lawsuits, the remaining dominant jurisdiction analysis is straightforward. Suit was first filed in El Paso. There is no claim that El Paso was an improper venue. The Contribution Agreement itself provides that "[a]ny action or proceeding brought for the purpose of enforcement of any term or provision of this Agreement shall be bought only in the federal or state courts sitting in El Paso, Texas, or Dallas, Texas." The general rule of dominant jurisdiction provides that where a suit would be proper in more than one county, the county in which the suit was first filed acquires dominant jurisdiction to the exclusion of other counties of equal stature. *Wyatt*, 760 S.W.2d at 248. "As long as the forum is a proper one, it is the plaintiff's privilege to choose the forum." *Id.*

**Was a Plea in Abatement a Prerequisite for the Injunction?**

In Issue Two, Encore contends the proper procedure for determining a court's dominant jurisdiction is limited to a plea in abatement filed in the court where the second lawsuit was filed. We could agree that as a matter of comity, or even courtesy between trial courts, the plea in abatement process is preferable. *See Atkinson v. Arnold*, 893 S.W.2d 294, 298 (Tex.App.--Texarkana 1995, no pet.)("Absent a showing that peculiar circumstances exist in this case to make the plea in abatement an inadequate remedy, a temporary injunction is inappropriate."). Under the unique procedural history of this case, however, we cannot say that it was required.

To be sure, most of the cases in this genre arise from rulings on a plea in abatement, and the Texas Supreme Court has specifically alluded to abatement of the case in the court with non-dominant jurisdiction. *Perry*, 66 S.W.3d at 252 ("As a rule, when cases involving the same subject matter are brought in different courts, the court with the first-filed case has dominant

16

jurisdiction and should proceed, and the other cases should abate."). While the problem of duplicative litigation may be resolved by pleas in abatement filed in the subsequent court, this is not always the rule. *See Perry*, 66 S.W.3d at 252; *In re Henry*, 274 S.W.3d 185, 193 (Tex.App.--Houston [1st Dist.] 2008, pet. denied).

The Texas Supreme Court has long recognized that Texas state courts are empowered to restrain persons from proceeding with suits filed in other courts of this state. *Gannon v. Payne*, 706 S.W.2d 304, 305 (Tex. 1986). "The general rule is that when a suit is filed in a court of competent jurisdiction, that court is entitled to proceed to judgment and may protect its jurisdiction by enjoining the parties to a suit subsequently filed in another court of this state." *Id.* at 305-06, *citing Cleveland v. Ward,* 116 Tex. 1, 23, 285 S.W. 1063, 1072 (1926)(seeking abatement in the subsequently filed case is not the only remedy in trial courts; upon proper showing, parties may receive from court which first obtained jurisdiction an injunction enjoining parties to second action from maintaining it). In *Cleveland*, the Texas Supreme Court determined that it was proper for the Texas court with dominant jurisdiction to enjoin the parties in the second suit from maintaining that action in the Texas court which did not have dominant jurisdiction. *Cleveland,* 116 Tex. at 23, 285 S.W. at 1072.

And in some ways, this case evokes the adage "what's sauce for the goose is sauce for the gander." *Lewis v. Peoples Sav. & Loan Ass'n*, 463 S.W.2d 284, 287 (Tex.Civ.App.--Austin 1971, writ ref'd n.r.e.). Borderplex drew first blood by filing a pleading seeking a temporary injunction. Yet rather than simply object to that procedure, Encore obtained its own *ex parte* TRO from the Dallas court. The Dallas court set a hearing on its own temporary injunction for the day after the El Paso court heard its temporary injunction. The El Paso court could have concluded time that the grant of the TRO threatened its jurisdiction. *See In re Amoco Fed. Credit Union*, 506 S.W.3d

17

178, 187 (Tex.App.--Tyler 2016, no pet.)(faulting second court's decision to grant TRO rather than on its own abate proceeding, when it had the relevant facts before it). To be sure, by the time of the July 9 hearing on the form of the El Paso injunction order, the El Paso court was informed that the Dallas TRO had expired and a temporary injunction was denied. The El Paso court, however, was not informed of why the temporary injunction was denied, and Encore has emphasized that the Dallas court has not yet decided the dominant jurisdiction question.[6]

Under the unique procedural posture of this case, we cannot conclude that the El Paso trial court abused its discretion by entering a temporary injunction before the Dallas court ruled on a plea in abatement. Issue Two is overruled.

## Propriety of Anti-Suit Injunction

In Issue One, Encore asserts that the El Paso court's anti-suit injunction is improper because Borderplex did not demonstrate that the limited circumstances for issuing an anti-suit injunction, and failed to meet the evidentiary standards for such injunctions.

A temporary injunction is an extraordinary remedy. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). The trial court must determine whether the applicant is entitled to preserve the status quo pending trial on the merits. *Id.* at 58. An anti-suit injunction is appropriate in four instances: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation. *Gannon*, 706 S.W.2d at 307; *Chandler v. Chandler*, 991 S.W.2d 367, 403 (Tex.App.--El Paso 1999, pet. denied). Citing *Gannon*, the Texas Supreme Court later explained that a party seeking to enjoin an *out-of-state* lawsuit must show that "a clear equity demands" the

---

[6] Encore recently asked that this Court take judicial notice of a subsequent order from Dallas court that denied a discovery request. The order states that its ruling on this or any other motion is not an indication that it has decided the dominant jurisdiction question.

18

injunction. *Christensen v. Integrity Ins. Co.*, 719 S.W.2d 161, 163 (Tex. 1986). The court also observed that "A single parallel proceeding in a *foreign* forum . . . does not constitute a multiplicity nor does it, in itself create a clear equity justifying an anti-suit injunction." *Id*. at 163, *citing Gannon,* 706 S.W.2d at 307. The case before us does not involve a foreign jurisdiction. Rather, it involves two lawsuits, each being filed in a different Texas county, subject to the same laws of this state.[7]

This case falls within the first anti-injunction criteria. *Gannon,* 706 S.W.2d at 307. The El Paso court could have concluded that its dominant jurisdiction was under threat of being improperly usurped because of Encore's second-filed lawsuit in Dallas County. Just a few days before the El Paso injunction hearing, the Dallas court had entered an *ex parte* TRO that allowed Encore to prosecute its suit regardless of how the El Paso court ruled on the injunction motion before it. We conclude that threat is sufficient to support the El Paso County court's injunction enjoining Encore from proceeding with its Dallas suit. The El Paso court is entitled to proceed to judgment and may protect its jurisdiction by enjoining Encore as a party to the subsequently-filed suit in the Dallas County court. *Gannon*, 706 S.W.2d at 305-06. Moreover, the El Paso court narrowly tailored its temporary injunction to the subject matter, claims, and parties relative to the Contribution Agreement, and expressly declared that Encore may prosecute fraud claims in Dallas that do not relate to or touch upon the Contribution Agreement. We review a trial court's decision to grant an "anti-suit injunction" under an abuse of discretion standard. *In re Henry*, 274 S.W.3d

---

[7] In support of its contentions, Encore relies heavily on anti-suit injunction cases in which a lawsuit was filed in Texas and another lawsuit was filed in a foreign jurisdiction, such as another state or nation. *See Golden Rule Ins. Co. v. Harper*, 925 S.W.2d 649, 650-651 (Tex. 1996)(concerning lawsuits filed in Texas and Illinois, and addressing limited circumstances in which, under principle of comity, court may exercise its power to enjoin foreign suits); *Christensen*, 719 S.W.2d at 163 (Texas and California); *Gannon*, 706 S.W.2d at 306 (Texas and Canada); *see also Rouse v. Texas Capital Bank, N.A.*, 394 S.W.3d 1, 3, 7 (Tex.App.--Dallas 2011, no pet.)(concerning lawsuits filed in Texas and Oklahoma, and recognizing that courts of sister states are considered foreign to each other).

at 189. We find no abuse of discretion in enjoining these acts.

Encores also contends that the trial court's erred in finding that Borderplex proved the traditional elements necessary for an injunction: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)(stating traditional elements for injunction). The third requirement--probable, imminent and irreparable injury- is the central focus for anti-suit injunctions. *See In re Henry*, 274 S.W.3d at 189-90 (noting traditional elements, but primarily discussing imminent and impending threat from parallel litigation). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Canteen Corp. v. Republic of Tex. Props., Inc.,* 773 S.W.2d 398, 401 (Tex.App.--Dallas 1989, no writ). Borderplex put on some evidence of the uncompensated loss its trustees might suffer if they were forced to litigate parallel litigation in Dallas. The trial court did not abuse its discretion in finding as a factual matter that Borderplex would be suffer a probable, imminent and irreparable injury if the injunction did not issue.

Issue One is overruled.

### MOTION TO STRIKE

The items still pending are: (1) Encore's request that we take judicial notice of a pleading in the Dallas case; and (2) Borderplex's motion to strike what have we referred to as the "declaration of non-liability" argument because it was new. We will take notice of the discovery order issued in the Dallas litigation. *See County of El Paso v. Navar*, 08-17-00058-CV, 2018 WL 2715298, at *4 (Tex.App.--El Paso June 6, 2018, no pet. h.)(taking notice of deed record); *Stephens v. LNV Corp.*, 488 S.W.3d 366, 372 (Tex.App.--El Paso 2015, no pet.)(taking judicial notice of

20

federal pleading in case remanded from federal court). We deny Borderplex's motion to strike the "declaration of non-liability" argument as new because Borderplex raised this very issue in its Appellees' Brief.[8] Accordingly, Encore might naturally reply that a party cannot seek a declaration of non-liability in a fraud case. While the response should have been in Encore's Reply Brief, we decline to strike it from the post-briefing filings. But even if true, the argument does not change our resolution of the issue because we look to the subject matter of the respective suits, and thus whether the causes of action arose from the same transaction or occurrence, in determining whether the claims are inherently interrelated.

## CONCLUSION

The subject matter of the two lawsuits are inherently interrelated. Because suit was first filed in El Paso County, the El Paso court is the court of dominant jurisdiction in these matters. Because the El Paso court was authorized to issue a temporary injunction to protect its dominant jurisdiction, the El Paso court's issuance of the anti-suit temporary injunction does not constitute an abuse of the El Paso court's discretion. The trial court's judgment is affirmed.


September 28, 2018

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.
McClure, C.J., not participating

---

[8] Borderplex advanced this argument in its brief as to why the suits are logically related:

> The Dallas court and the trial court may also reach inconsistent judgments. Borderplex seeks a declaration of no liability "of any kind," which would effectively preclude any finding of fraud against Borderplex (and by extension its Board of Trustees). Any recovery by Encore in the Dallas case would be inconsistent with the non-liability declaration that Borderplex seeks in this case.

21