**Opinion filed February 6, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00255-CV

_____

## IN RE: MIDLAND 1235 INVESTMENT TRUST; FARAH N. IRVIN-MATOTT; AND JAMES LANCE IRVIN

**Original Mandamus Proceeding**

### M E M O R A N D U M   O P I N I O N

This original proceeding concerns various orders signed by the trial court in connection with a receivership of the Midland 1235 Investment Trust. Relators, Farah N. Irvin-Matott (Farah) and James Lance Irvin (James), seek a writ of mandamus compelling the trial court to dissolve the receivership and deny the receiver the authority to take further action on behalf of the trust. Farah and James also seek a writ of mandamus ordering the trial court to withdraw its order requiring Farah to comply with previous court orders. Because we conclude that the trial court did not clearly abuse its discretion, we deny the petition.

## I. *Factual and Procedural Background*

In 2017, Caleb Matott created the MAGA 2017 CFM Trust. The sole beneficiary of the trust was Farah, who was Caleb's spouse at the time. The trust's principal asset is a commercial building that the trust leases to STEP Energy Services (USA) Ltd. (STEP). Prior to the receivership, the rents on the property were managed through a company known as Chic Property Management (Chic).

After the trust was created, Caleb filed a divorce action against Farah in the 318th District Court of Midland County. During the divorce proceedings, Caleb sought a temporary injunction against Farah, James, Kristi Rider, and Tracey Foote, alleging that each of them had engaged in misconduct while acting as trustees. Following a hearing, the trial court determined that Farah and others had "engaged in or were complicit in multiple breaches of provisions of Title 9 of the Texas Property Code . . . including breaches of trust of the MAGA CFM 2017 Trust." These breaches included the conveyance of the STEP building to the Midland 1235 Investment Trust. In this regard, the conveyance of the building occurred after the trustees were approached with a request to expand the facility; however, the trust instrument prohibited the trustees from using trust proceeds to purchase land. According to Farah and James, the building had been placed into a separate trust for the purpose of completing the expansion project. In addition to determining that Farah and James had improperly conveyed the STEP building into a separate trust, the trial court determined that the STEP building had been wrongfully used as collateral for a $1,000,000 loan, that Farah and others were in possession of rents from the STEP building, and that they had wrongfully obtained as much as $1,000,000 in loaned funds (or access to loaned funds).

2

The trial court granted Caleb's request for a temporary injunction, imposing relief under the Texas Trust Code. *See* TEX. PROP. CODE ANN. § 114.008 (West 2023) (providing remedies for breach of trust, including injunctions against breaches of trust and orders compelling a trustee to redress a breach of trust). Among other things, the trial court's order required Farah to deposit into the registry of the court all rents received since January 1, 2017 and all proceeds from loans collateralized by the building since January 1, 2017. The trial court later signed a temporary injunction to the same effect. According to STEP, these orders effectively suspended ongoing work relating to the expansion project.

Farah filed an interlocutory appeal challenging the injunction issued by the trial court. *Matott v. Matott*, No. 11-22-00362-CV, 2023 WL 2415279 (Tex. App.—Eastland Mar. 9, 2023, no pet.) (mem. op.). While the appeal was pending, the trial court signed an order approving the parties' agreement to appoint Real Party in Interest Roy Jackson as the receiver to manage the assets of both trusts. Pursuant to the terms of the receivership, Farah, along with several others, had no "authority to manage the property or business of the Trusts" until further order of the court, and the receiver had "complete and exclusive control and possession of the Trusts and the Property," subject to existing leases or rental agreements with STEP. The parties' agreed order further enjoined the trustees from "disturbing the possession of the Property or other property that is the subject of this order," taking "actions that would . . . have an adverse impact on the value of the Property," and "collecting any rents or other sums in connection with the Property." Like the trial court's temporary injunction order, the parties' agreed order appointing the receiver was based on the Texas Trust Code, which provides that a breach of trust may be remedied by the

3

appointment of a receiver "to take possession of the trust property and administer the trust." PROP. § 114.008(a)(5) (West 2023).

Following the entry of the receivership order, we dismissed Farah's interlocutory appeal as moot based on a related order in which the trial court dissolved the temporary injunction. *Matott*, 2023 WL 2415279, at *2. On June 2, 2023, the trial court severed the receivership from the divorce proceeding so that the judgment in the divorce action could become final. Thereafter, Farah and James filed a motion to terminate the receivership, which the trial court denied in March 2024.

In the meantime, the receiver resumed the STEP building expansion project, and, by April 2024, the expansion was virtually complete. However, during the process of the expansion, the trust had accumulated substantial debt. The receiver claims that, as of July 31, 2024, the total liabilities of the trust were approximately $4.6 million. Among other things, these liabilities included a line of credit that the trust had established with Real Party in Interest First National Bank of Stanton (FNB Stanton). Additionally, the trust owed delay damages to STEP that exceeded $500,000, and Real Party in Interest Randco Industries, Inc. was threatening to foreclose under a mechanic's lien.

In an effort to address the trust's obligations, the receiver entered into negotiations with FNB Stanton and STEP that culminated in a proposed settlement, which included three key components. First, STEP would agree to execute an amended lease that increased its rent. Second, STEP would agree to waive its claims for delay damages, and to instead pay $564,692.15 to the trust, which funds would be used by the trust to partially pay Randco and forestall foreclosure proceedings. Third, FNB Stanton would approve the settlement so that the increased rentals could

4

be used to retire its indebtedness. However, Farah and James, who allege that they are personally liable for the trust's debt, refused to approve the settlement.

During the same timeframe, the receiver also initiated efforts to market the STEP building to potential buyers. Toward that end, the receiver secured a letter of intent from Dahlia Development, LLC (Dahlia) to purchase the building. In response to the receiver's efforts to resolve the debt and sell the building, Farah initiated a series of communications that, according to the trial court's findings of fact and conclusions of law, could have potentially affected the value of the property, which constituted a violation of the trial court's previous order.

For example, while negotiations relating to FNB Stanton's debt were ongoing, Farah sent an e-mail to Boyd Finch at FNB Stanton. In the e-mail, Farah indicated that she refused to sign a new loan agreement going forward and argued that "Randco needs to go after STEP." She further stated, "If the bank must foreclose, then that is what y'all need to do but at least the Trust will have the ability to file a lawsuit against STEP." Similarly, after the receiver had secured the letter of intent from Dahlia, Farah sent an e-mail to three representatives of Dahlia accusing the receiver of attempting a "quick sale" of the property and stating her intent to "fight this aggressively." She further accused the receiver of mishandling funds and stated that her attorney would be "sending out subpoenas for [their] testimony." Farah also sent letters to STEP Energy, using Chic letterhead, demanding that STEP make payments that were allegedly due under the lease and stating, "If prompt payment is not received . . . legal action to enforce your obligations will be taken at the sole expense of STEP."

As a result of Farah's and James's refusal to approve the settlement, the receiver filed motions seeking approval from the trial court to execute the amended

lease and for leave to market the building for sale. Additionally, the receiver filed a motion to enforce the trial court's receivership order, alleging that Farah had violated the order on multiple occasions. In response, Farah and James filed another motion to dissolve the receivership.

The trial court held hearings on the pending motions in April, July, and August 2024. During these hearings, evidence was adduced that Farah had intentionally violated the trial court's temporary injunction by failing to release funds that the trial court had ordered to be deposited into the registry of the court. Additionally, evidence was presented that Farah had attempted to collect rent on the property using Chic's letterhead, in further violation of the trial court's order. Furthermore, when Farah was asked about what the Trustees would do to resolve the indebtedness of Midland 1235, she indicated that while the trustees had a plan, she would not discuss it "at this time."

Brendan Griffin, a forensic accountant who was employed by the receiver until the end of 2023, testified that he had several concerns about the receiver's actions in handling trust affairs. First, Griffin expressed concern that the trust was reporting its assets based on their fair market value, rather than their "book value." Griffin and the receiver agreed that Griffin should help resolve the issue, but the corrections were "very involved," and Griffin left the receiver's employ before he could undertake the corrections.

Griffin testified that the receiver owned a separate company called Energy OnRamp that performed accounting services. However, all of the accounting that was billed by Energy OnRamp was actually performed by the receiver's employees. According to Griffin, Energy OnRamp billed something "in the tune of $10,000 a month" for accounting services, adding that he did not bill his time while working

on the STEP project because the receiver "was collecting accounting fees through Energy OnRamp, so [he] didn't feel comfortable charging [his] time to do accounting work." While Griffin was not familiar with the receiver's contract, he performs receivership services on his own and his fees "would not have been as expensive because [he] would not have billed in the way [the receiver] billed."

Griffin testified that, after a law firm sent a $22,000 bill to the trust for payment, the funds to pay the bill were moved to the receiver's bank account, where it was "used to make payroll" for the receiver rather than paying the law firm's bill at that time. Griffin indicated that when he confronted the receiver about the use of those funds, "[h]e understood it was wrong, and he was going to make it right." He added that the issue was then corrected by the receiver within the next few months. Griffin also expressed concerns that the receiver was not providing supporting documentation in connection with his reports to the trial court. He stated that, when he asked the receiver about whether supporting documentation should be included with the reports, the receiver responded that it was not required.

Griffin testified that STEP had made numerous change requests in connection with the construction of the building that were charged to a line of credit that was guaranteed by Farah and James, but which were never billed to STEP. While he did not know the exact amount that had been charged to the line of credit, Griffin estimated that it was "in the hundreds of thousands" of dollars. Griffin stated that, because the receiver failed to seek reimbursement for the cost of the changes, the receiver did not have enough money to pay its taxes. He indicated that, in his opinion, the receiver's failure to collect reimbursement for the change requests "was a mismanagement" by the receiver. Nevertheless, Griffin admitted during cross-examination that he did not perform a full accounting of the receivership, that his

7

knowledge of "everything that's been going on" was limited, and that he did not observe any activities that should be reported to law enforcement. He also admitted that he had no opinion regarding what would be in the best interest of the trust going forward.

The trial court denied the motions to dissolve the receivership, and instead issued an order granting the receiver's motion to sign the third amended lease. It also ordered the receiver to "undertake efforts to sell the property." To further the sale of the property, the receiver was required to identify a real estate broker. The trial court's order also established a process by which the remaining parties could make objections to the proposed broker. After a broker was retained, the order authorized the receiver to execute a contract for the sale of the property and required the receiver to "submit a motion to the Court seeking approval of the sale contract, via submission." The trial court also signed an order requiring Farah to "fully abide [by] and follow" the court's receivership orders.

After the trial court signed its orders, Farah and James filed a petition for writ of mandamus, requesting that we order the trial court to dissolve the receivership and "withdraw the order compelling [Farah] to comply with court orders." The trial court then signed findings of fact and conclusions of law in connection with its orders. Those findings included—in relevant part—the following:

- That Farah had "taken . . . actions that violate the Agreed Order Appointing Receiver and the Supplemental Receivership Order";

- That Farah had "acknowledged that she violated the Court's . . . Temporary Restraining Order";

- That Farah "took actions to violate other court orders, in addition to the Receivership Orders";

- That the receivership "was necessary to, among other things, complete the expansion of the STEP building - not only physical completion of the

8

structure, but also resolution of the indebtedness owed by the trust to First National Bank of Stanton, STEP Energy, and Randco in a manner that protected the value of the Property and the Trust";

- That Farah had refused to provide any testimony in support of an alternative plan for resolving the trust's debts;

- That the terms of the proposed lease were "fair and reasonable" and that "its execution [was] in the best interest of the Trust and its beneficiaries";

- That, "[b]ased on the actions of the parties, the prior violations of the Court's receivership order, and the circumstances that exist, . . . the continuation of the receivership is in the best interest of the Midland 1235 Investment Trust";

- That the receiver "did not take any actions . . . that would require his immediate removal"; and

- That, based on Griffin's testimony that "none of the receiver's actions and/or choices rose to the level of needing to be reported to law enforcement or any other appropriate authorities," "the receiver had not violated his obligations to the Trust and, therefore, did not need to be removed."

## II. *Mandamus – Standard of Review*

Mandamus is an "extraordinary" remedy that is "available only in limited circumstances." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). A writ of mandamus will issue only if the trial court clearly abused its discretion, and the relator has no adequate remedy on appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). With respect to the first requirement, a trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *In re A.L.M.-F.*, 593 S.W.3d 271, 282 (Tex. 2019); *In re Cerberus Cap. Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). In addition, because a trial court has no discretion in determining what the law is or in applying it to the facts, a trial court abuses its discretion if it fails to correctly analyze or apply the law.

*See Prudential*, 148 S.W.3d at 135; *see also In re J.B. Hunt Transp., Inc.*, 492 S.W.3d 287, 294 (Tex. 2016) (orig. proceeding).

Further, to show an abuse of discretion, a party seeking mandamus relief must demonstrate that the trial court "could have reached only one conclusion and that a contrary finding is thus arbitrary and unreasonable." *In re State Farm Lloyds*, 520 S.W.3d 595, 604 (Tex. 2017) (orig. proceeding). In this regard, an "appellate court [in a mandamus proceeding] may not substitute its judgment for the trial court's determination of factual or other matters committed to the trial court's discretion, even if the mandamus court would have decided the issue differently." *Id.*

### III. *Analysis*

#### A. *Denial of the Motions to Dissolve the Receivership*

In their first issue, Farah and James complain that the trial court abused its discretion when it denied their motions to dissolve the receivership. Because this is a mandamus proceeding, we review the trial court's decision for a clear abuse of discretion. *Walker*, 827 S.W.2d at 839; *Chandy v. Kerala Christian Adult Homes, LLC*, 618 S.W.3d 880, 886 (Tex. App.—Dallas 2021, no pet.) ("We review the trial court's decision whether to terminate a receivership under an abuse of discretion standard.").

Once a receivership has been established, it should not be terminated as long as it continues to exist for a valid purpose. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. E-Court, Inc.*, No. 03-02-00714-CV, 2003 WL 21025030, at *6 (Tex. App.—Austin May 8, 2003, no pet.) (mem. op.);[1] *see also Massey v. Greenwood*,

---

[1]We agree with *Akin* that, once established, a receivership may continue as long as it has a valid purpose. 2003 WL 21025030, at *6. However, we note that the court's holding in *Akin* was based, in part, on its rejection of the argument that a receivership can be dissolved once an alternative legal remedy

56 S.W.2d 1103, 1105 (Tex. App.—Texarkana 1932, no writ) (A receivership "may be vacated or dissolved at any time upon proper showing that the allegations upon which it was based are untrue."). In this instance, the trial court previously determined that the trustees, including Farah and James, had committed breaches of trust that jeopardized the assets of the trust, and it appointed a receiver to conclude the expansion project on the building. Further, the trial court reasonably determined that, to fully complete his duties, the trustee was required to address the substantial debt that had been incurred during the expansion process, debt that remains unresolved. Additionally, because Farah (1) repeatedly violated the trial court's orders relating to the trust, (2) knowingly did so on at least one occasion, and (3) refused to testify to any alternative plan for resolving the trust's debts, the trial court reasonably determined that further risk would be imposed upon the trust if the receivership were dissolved.

Farah and James assert that the receivership should have been dissolved because the receiver (1) had acted unethically, (2) had "conflicts of interest issues," and (3) "thoroughly mismanaged the Trust." Their argument is misplaced. Farah and James did not ask the trial court to *remove* the receiver. Instead, they asked the trial court to dissolve the receivership itself. Here, the alleged misconduct of the

becomes available. *Id.* Specifically, the *Akin* court determined that, because the receivership had been created pursuant to an existing statute, a showing of an inadequate remedy at law was unnecessary to either establish *or* maintain the receivership. *Id.* (citing *Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 136 S.W.2d 800, 806 (Tex. 1940) (holding that a showing of an inadequate remedy at law was unnecessary under Article 2293 of the Revised Civil Statutes of 1925)). Conversely, we have held that "[e]ven if a specific statutory provision authorizes a receivership, a trial court should not appoint a receiver if another remedy exists, either legal or equitable." *In re Estate of Hallmark*, 629 S.W.3d 433, 437 (Tex. App.—Eastland 2020, no pet.) (citing *Benefield v. State*, 266 S.W.3d 25, 31 (Tex. App.—Houston [1st Dist.] 2008, no pet.)). Thus, while we agree with *Akin's* primary holding insofar as it concerns the ongoing *maintenance* of a receivership, our reliance on *Akin* should not be construed as an abandonment of our holding in *Hallmark*.

receiver in handling the property at issue had nothing to do with whether the purpose of the receivership had been fulfilled. *See Akin*, 2003 WL 21025030, at *6.

Furthermore, even if these assertions were somehow relevant, the trial court concluded that "the receiver had not violated his obligations to the Trust and, therefore, did not need to be removed." While some of Griffin's testimony regarding the conduct of the receiver is concerning, the trial court, who had the benefit of hearing the testimony of the witnesses and observing their demeanor during the hearings, was the best arbiter of the weight and credibility of such evidence. *See In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006) ("It is well established Texas law that an appellate court may not deal with disputed areas of fact in an original mandamus proceeding.") (quoting *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex. 1990)). Thus, we conclude that the trial court did not clearly abuse its discretion in assigning weight to Griffin's testimony that addressed the receiver's alleged misconduct, particularly in light of Griffin's level of involvement in the management of the receivership.

Farah and James also argue that, before the receiver assumed control over the operations of the building, its debt was relatively small, and that such debt had increased considerably throughout the course of the receivership. While it was undisputed that the trust had incurred significant liabilities during the expansion project, we believe the trial court could have reasonably concluded that the receivership's debt resulted from circumstances other than the alleged misconduct of the receiver, including the substantial late fees that were incurred because of delays in completing the project.

Finally, Farah and James argue that the receiver acted improperly by taking the interests of STEP into consideration in its decisions. In support of their

argument, Farah and James point to the receiver's response to their motion to dissolve the receivership, in which the receiver stated that one of the receivership's purposes was to "protect" STEP. The receiver, however, does not owe Farah and James an exclusive fiduciary obligation, as their argument suggests. Instead, a receiver "is an 'officer of the court, the medium through which the court acts. He is a disinterested party, the representative and protector of the interests of all persons.'" *Akin*, 2003 WL 21025030, at *4 (quoting *Security Trust Co. of Austin v. Lipscomb Cnty.*, 180 S.W.2d 151, 158 (Tex. 1944)). Contrary to the argument advanced by Farah and James, one of the receiver's functions in carrying out its duties is to "protect" the interests of STEP.

Although certain contentions raised by the parties were in dispute, we may not reconcile disputed factual matters in a mandamus proceeding. *See State Farm Lloyds*, 520 S.W.3d at 604; *Angelini*, 186 S.W.3d at 560; *In re Walton*, No. 11-16-00230-CV, 2017 WL 922418, at *1 (Tex. App.—Eastland Feb. 28, 2017, orig. proceeding) (mem. op.). Based on this record, we conclude that the trial court did not clearly abuse its discretion when it denied Farah's and James's motions to dissolve the receivership. Accordingly, we overrule the first issue raised by Farah and James.[2]

B. *The Sale of the STEP Building*

In their second issue, Farah and James complain that the trial court abused its discretion "by authorizing the Receiver to sell" the STEP building in light of the

---

[2]Because we have determined that the trial court did not clearly abuse its discretion when it denied the motions to dissolve the receivership, we do not address STEP's argument that Farah and James also have an adequate remedy by appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(2) (West Supp. 2024) (allowing interlocutory appeals from an order that "overrule[] a motion to vacate an order that appoints a receiver").

receiver's "misappropriation of trust funds, mismanagement, and conflicts of interest."

However, and importantly, the trial court's order does not authorize the sale of the building. It merely establishes a process by which a proposed sale can be presented to the trial court. As such, the request for relief advanced by Farah and James relating to the sale of the building is premature and not ripe for determination. *See In re Watson*, 259 S.W.3d 390, 393 (Tex. App.—Eastland 2008, orig. proceeding) (denying a petition for writ of mandamus as premature because the trial court had issued conditional discovery orders, and therefore had not yet "fully exercised its discretion"). Furthermore, the trial court rejected Farah's and James's argument that the receiver has engaged in substantive misconduct in handling the affairs of the receivership. Thus, these arguments should not, in any event, impact the ongoing efforts of the receiver to proceed with an attempt to sell the building, subject to the final approval of the trial court.

Accordingly, we overrule the second issue raised by Farah and James.

C. *The Compliance Order*

In their third issue, Farah and James complain that the trial court abused its discretion when it ordered Farah to comply with the court's prior receivership orders, to which Farah had agreed, that prohibited her from interfering with the management of the trust. In that regard, Farah and James do not challenge the trial court's authority to sign the agreed order appointing the receiver, which prohibited the trustees from taking actions that would have an adverse impact on the property's value, nor do they challenge the basis for the order or the order's directives. Instead, they argue that Farah's actions "were in pursuit of her legitimate rights."

"The trial court has inherent power which it may use to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity." *In re Marriage of Powell*, 170 S.W.3d 156, 158 (Tex. App.—Eastland 2005, no pet.); *see also Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979). As such, "[t]he trial court has vast discretion to maintain control of the proceedings before it." *Powell*, 170 S.W.3d at 158.

Among other things, the trial court's inherent powers include the power to sanction. *Brewer v. Lennox Hearth Products*, LLC, 601 S.W.3d 704, 718 (Tex. 2020). As we recently observed, however, such sanction orders are not without limitations. *In re Lee*, 686 S.W.3d 449, 462 (Tex. App.—Eastland 2024, orig. proceeding) (recognizing that all sanctions must be just). For instance, there must be "a direct relationship . . . between the offensive conduct and the sanction imposed." *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *see also Lee*, 686 S.W.3d at 463.

In this case, the trial court did not order Farah to pay attorneys' fees, nor did it dismiss any of her claims or impose other monetary or punitive sanctions. Instead, it merely issued an admonishment that she adhere to and comply with the trial court's orders. Accordingly, we must consider whether, in light of the trial court's findings, ordering such a condition, which trial court's routinely do in similar circumstances, constitutes a clear abuse of discretion. *See Prudential*, 148 S.W.3d at 135; *Powell*, 170 S.W.3d at 158.

Farah and James argue that Farah's e-mail to Dahlia was justified because: (1) Farah only made factually correct statements in her communication to Dahlia, (2) Farah was personally liable for the trust's debts, (3) the e-mail did not "threaten" Dahlia, and (4) there were "serious questions" about the "validity" of the letter of

15

intent because the trust might bankrupt. We are not persuaded by any of these suggested justifications.

The agreed order appointing the receiver did not only prohibit Farah from making false statements to persons doing business with the trust, nor did it merely prohibit Farah from "threatening" third parties. Instead, it prohibited her from doing *anything whatsoever* that would disturb the receiver's operations in managing the property and from taking any actions that would have an adverse impact on the value of the property. Farah's e-mail stated that the purchase of the property would be subject to a legal challenge and informed the potential purchaser that it would be involved in legal proceedings if the sale was approved. Such statements by her made it clear that proceeding with the sale would result in a protracted legal battle and that the ensuing litigation would cause Dahlia to incur additional time and expense. Indeed, such statements could have reasonably affected Dahlia's decision and willingness to complete the transaction. Likewise, while Farah may have legitimate questions about the transaction and its effect on her personal liabilities, such questions could have and should have been raised before the trial court, rather than in an e-mail to a third party.

Farah and James also argue that Farah's letters to STEP attempting to collect on outstanding invoices were justified because they "predated the receivership" and were for various items that were "requested by STEP Energy." Farah maintains that because the receiver proposed to waive "all of Chic's invoices," she has "every right to pursue collection of them."

We are likewise unpersuaded by this proposed justification. Farah and James do not cite any authority for the proposition that their disagreement with the receiver's management of the trust somehow gave Farah a "right" to interfere in the

16

receiver's efforts to negotiate a resolution of the debts in question, particularly in light of the agreed order, by which the trial court had enjoined them from the very form of interference that they claim to have undertaken.

We conclude that the trial court did not clearly abuse its discretion when it found that Farah was in violation of the parties' agreed order and then admonished her to comply with the trial court's orders in the future. Accordingly, we overrule the third issue raised by Farah and James.

## IV. *This Court's Ruling*

The petition for writ of mandamus filed by Farah and James is denied.[3] Because of our disposition, we withdraw our order dated September 18, 2024, that directed the trial court and the receiver to refrain from taking any actions relating to the sale of the building.

W. STACY TROTTER
JUSTICE

February 6, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

---

[3]Our disposition does not preclude Farah and James from filing a direct appeal or petition for writ of mandamus in the future, if appropriate, that relates to the sale of the building.